817 P.2d 251

**STATE of New Mexico,**
**Plaintiff–Appellant,**

**v.**

**Frutoso LOVATO, Steve McCrary, Macy Alderette, and Anthony Contreras, Defendants–Appellees.**

**No. 12391.**

Court of Appeals of New Mexico.

July 2, 1991.

Certiorari Denied Aug. 12, 1991.

Tom Udall, Atty. Gen. and Patricia Gandert, Asst. Atty. Gen., Santa Fe, for plaintiff-appellant.

Jacquelyn Robins, Chief Public Defender and Gina Maestas, Asst. Appellate Defender, Santa Fe, for defendants-appellees.

## OPINION

DONNELLY, Judge.

The state appeals from an order of the trial court suppressing evidence seized as a result of a stop of an automobile by police following a report of a drive-by shooting. We discuss: (1) whether there was reasonable suspicion for the stop; (2) whether the trial court's order suppressing evidence is supported by substantial evidence; (3) whether the trial court should be affirmed on alternative grounds because, *as a matter of law*, the stop constituted an arrest requiring a showing of probable cause; and (4) whether opening the door of the car by police amounted to an illegal search and seizure. We reverse and remand for further proceedings consistent herewith.

## FACTS

At approximately midnight, October 31, 1989, Albuquerque city police officers received a report of a drive-by shooting on Sprunk Street in the Martineztown area of Albuquerque. A radio dispatch was issued to officers in the vicinity requesting that they attempt to locate a white Chevrolet Impala described as having been seen leaving the area.

Officer Ross Lucero testified at the hearing on the motion to suppress. He stated that he was in a patrol car accompanying another officer when the radio dispatch was received. At that time Lucero's vehicle was at Broadway and Stadium. The police car, in which Lucero was a passenger, drove toward Martineztown, proceeding north on Edith. As the officers drove to the area, a 1976 white Impala vehicle pulled out of a side street in the Martineztown area and headed south on Edith. When Lucero saw the car, he told the other officer, "That has to be them." No other vehicles were in the area.

The police car continued north past Grand Avenue, made a U-turn, and followed the Impala for less than a minute before stopping it. The car had five male occupants. Upon stopping the vehicle, Lucero testified that the officers initiated "felony stop" procedures. He called for back-up units; he then required the occupants of the Impala to lace their fingers behind their necks; when the other units arrived, he required the occupants of the Impala to get out of the vehicle one by one from the driver's door and walk backwards toward the back of the car; the occupants of the Impala were then handcuffed. The officers had their guns drawn at this time.

After the five individuals exited the vehicle, Lucero testified that he was uncertain whether another person might be hiding in the vehicle or lying on the floor of the car. Two officers approached the car, one on either side, with their guns drawn. The car did not have tinted windows. Lucero stated he was on the right side of the car. As he opened the door to investigate whether there were other occupants, a shotgun fell out onto the ground. The

shotgun was seized as evidence and the occupants were arrested.

During questioning at the hearing on the motion to suppress, Lucero testified that the "attempt to locate" the vehicle described as having been seen leaving the area referred to an "older model" Impala. After hearing a tape of testimony he gave at an earlier probation revocation hearing, Lucero acknowledged that he said the attempt to locate was put out on a "late" or "later" model car. He also testified that he thought "late" model meant "older" model.

Prior to the stop, the police broadcast did not indicate the number of people involved in the shooting, the license number of the suspect vehicle, or the direction the vehicle was believed to be traveling. Defendants' testimony at the motion to suppress indicated that they were driving away from the Martineztown area at the time they were stopped, that there were three people in the front seat and two in the back, and that the vehicle was a two-door car.

Following the hearing, the court ordered that the evidence be suppressed. The court's written order stated:

> After having weighed the testimony, the Court finds that the specific facts available to the officer making this stop combined with the other information available to the officer lacked the necessary degree of specificity and was insufficient to support inferences that the vehicle stopped was related to illegal conduct. Therefore, the Court finds that the officer lacked reasonable articulable suspicion to stop defendants' vehicle.

## I. *REASONABLE SUSPICION FOR THE STOP*

The trial court determined that the officers who made the initial stop lacked sufficient specific information to give rise to a reasonable articulable suspicion that the vehicle being stopped had been or was involved in illegal conduct. Assuming the trial court did not reject the state's uncontradicted showing, we disagree.

As observed by this court in *State v. Cobbs*, 103 N.M. 623, 626, 711 P.2d 900,

903 (Ct.App.1985), "in appropriate circumstances, a police officer may detain a person in order to investigate possible criminal activity, even if there is no probable cause to make an arrest." The court in *Cobbs*, quoting in part from *State v. Galvan*, 90 N.M. 129, 131, 560 P.2d 550, 552 (Ct.App. 1977), further observed that " '[a]ppropriate circumstances' arise from the officer's 'reasonable suspicion' that the law is being or has been broken." Thus, an officer making an investigative stop must have a reasonable suspicion, based upon specific articulable facts and any rational inferences that can reasonably be drawn from such facts, that the law has been or is being violated. *State v. Cobbs; State v. Galvan.* The facts known to the officers in this case, if accepted, were sufficient to support a reasonable suspicion that the vehicle stopped had been involved in the reported drive-by shooting.

It is undisputed that there was an "attempt to locate" put out on a white Impala, suspected in a drive-by shooting in Martineztown, that the radio dispatch did not include information on the license number of the car or the number of occupants in the vehicle. It is similarly undisputed that the incident involving the reported shooting occurred around midnight, the car occupied by defendants met the general description radioed by the police dispatcher, and there was no other vehicular traffic in the area. The facts also indicate that defendants' white Impala turned onto Edith heading away from Martineztown shortly after the police broadcast. The officers observed five individuals in the Impala, a fact they considered suspicious in what was described as a high drug area.

These facts provide a proper basis for an investigative stop. *State v. Cobbs; see also United States v. Taylor*, 716 F.2d 701 (9th Cir.1983). Defendants argue that the police stop of their vehicle was improper because the officers did not know if the vehicle involved in the shooting was an older or newer model. Officer Lucero testified that defendants' vehicle was an older model. Although he testified that the po-

lice dispatch referred to a late model car, Lucero stated he thought late model meant "old." Thus, from the perspective of the officer, the facts known to him included the fact that the vehicle involved in the shooting was an older vehicle. Additionally, defendants contend the officers did not know where the Impala was in relation to the scene of the reported crime when the vehicle was stopped. Although the officers indicated that they did not know exactly where Sprunk Street was, Lucero testified that he knew the patrol car in which he was riding was headed toward Martineztown and, when defendants' vehicle turned onto Edith heading toward the officers, it appeared to be heading away from the Martineztown area minutes after the reported shooting and at a time when no other vehicles were driving in the area.

We believe this case is similar to *State v. Watley*, 109 N.M. 619, 788 P.2d 375 (Ct. App.1989), in which this court upheld the validity of an investigatory stop. In *Watley* there was a recently reported crime late at night, the defendant was the only person in the vicinity, and he generally matched the description given. *See also United States v. Henning*, 906 F.2d 1392 (10th Cir.1990) (police held to have reasonable suspicion to stop vehicle seen driving away from area where gunshot was heard).

In sum, we conclude that the facts known to the officers, as related by Officer Lucero, and the inferences that could be drawn from the facts were sufficient to justify a reasonable suspicion on the part of the police that the vehicle in question had been involved in the drive-by shooting reported minutes earlier. This conclusion is premised on the trial court having accepted the officer's testimony at the hearing. Thus, if the testimony was accepted, then the officers were justified in making an investigatory stop to determine whether the car in question was in fact the vehicle involved in the earlier reported shooting. We next consider defendants' argument that the trial court did not accept the officer's testimony.

## II. STANDARD OF REVIEW

Defendants argue that it is possible the trial judge rejected all or most of the officer's testimony after finding him to be not credible. If this is true, defendants contend, then this court should affirm. Defendants correctly point out that the issue on appeal is whether the result is supported by substantial evidence, not whether the trial court could have reached a different conclusion. *See State v. Anderson*, 107 N.M. 165, 754 P.2d 542 (Ct.App.1988).

Based on this standard of review, defendants argue that the trial court's order in this case should be affirmed. Factually, defendants argue that this court should assume that the trial court rejected virtually all of the officer's testimony because the trial court did not consider the officer to be a credible witness. Defendants argue that under our standard of review we should assume that the trial court did not believe any of the officer's testimony, including his testimony about the radio dispatch and the information received by that dispatch.

In support of their argument that the trial court could have disbelieved Officer Lucero's testimony, defendants point to the fact that he was confused as to the meaning of "late model" with reference to the dispatcher's description of the white Impala and also to an exchange between the court and that witness regarding the officer's not remembering exactly when he testified in an earlier probation revocation hearing. At one point the court commented, "If you come in here and you're telling me you don't even remember when you testified [previously], you know, your credibility is going to be shot with me." With regard to the officer's misunderstanding as to the meaning of "late model" with reference to the car, he said that he thought that meant an older car. The Impala was either a 1975 or a 1976 model. This misunderstanding has little significance. The term "late model" is susceptible to different interpretations. In the parlance of automobile dealers, it apparently means a newer model. With respect to the trial court's comments about the witness's credibility "is going to be shot with me,"

read in context, this appears to be no more than a warning to the policeman to tell the truth.

Although these contentions fall short of discrediting the officer's testimony, nevertheless, because of the disposition we make, the trial court will have an opportunity to give its reasons for rejecting the testimony of the officer, if in fact that was a factor in the court's ruling. The record before us does not, however, affirmatively indicate that this was the basis for the court's decision.

Nothing in the record suggests that the trial court rejected the testimony of the officer. Moreover, nothing in the testimony below or the arguments of counsel suggests that the basic facts concerning the radio dispatch or its content were in dispute. Instead, defense counsel below focused on specific details concerning the year of the vehicle being sought, the direction of the car in relation to the place of the shooting, and related matters. Similarly, the order of the trial court suppressing evidence herein focused on whether the officer effecting the stop of defendants' car possessed "specific facts available * * * combined with other information" so as to constitute specific articulable facts justifying the investigative stop of the vehicle. The order did not specifically address the court's determination concerning the credibility of the state's witness at the hearing on the motion to suppress.

█ In order to facilitate review on appeal, where the fact-finder rejects uncontradicted testimony based solely on a determination of credibility, the better procedure in such cases would be for the trial court to indicate in the record the reasons for rejecting uncontradicted testimony. *White Glove Bldg. Maintenance, Inc. v. Brennan*, 518 F.2d 1271 (9th Cir.1975). Such action facilitates appellate review and obviates the issue of whether uncontradicted testimony was rejected based on credibility, as argued here.

█ A trial court is not required to accept uncontradicted testimony as true if (1) the witness is shown to be unworthy of belief, or (2) his testimony is equivocal or contains inherent improbabilities, or (3) concerns a transaction surrounded by suspicious circumstances, or (4) is contradicted, or subjected to reasonable doubt as to its truth or veracity, by legitimate inferences drawn from the facts and circumstances of the case. *Hernandez v. Mead Foods, Inc.*, 104 N.M. 67, 716 P.2d 645 (Ct.App.1986); *see also Sosa v. Empire Roofing Co.*, 110 N.M. 614, 798 P.2d 215 (Ct.App.1990) (when a finding is made against the party with the burden of proof, appellate court can affirm such a finding if it was *rational* for the fact-finder to disbelieve the evidence offered in support of that finding). In some cases it may be possible for the reviewing court to ascertain from the record a rational basis for the lower court to have rejected uncontradicted testimony; in other cases, like the case before us, it is not so easily determined. Therefore, we adopt this rule which will facilitate appellate review. *See White Glove Bldg. Maintenance, Inc. v. Brennan.*

We address defendants' alternative grounds for affirmance which may arise on remand if the trial court finds the state's uncontradicted proof credible.

## III. ARREST vs. STOP

█ Defendants argue, as an alternative basis for affirmance, that the "stop" carried out by the police was in fact an arrest due to its intrusive nature, and because the police lacked probable cause to support the arrest. Defendants correctly point out that this court will affirm the trial court if it is right for any reason. *State v. Beachum*, 83 N.M. 526, 494 P.2d 188 (Ct.App.1972). Thus, defendants contend that this issue is properly argued on appeal even though it was not raised in the trial court. However, because this issue was not presented to the trial court, we do not have the benefit of the trial court's findings of fact on the factual issues incident thereto. *See State v. Cobbs* (whether an arrest has occurred depends on the facts of each particular case). Thus, the issue is whether, as a matter of law, the intrusive nature of the stop renders the encounter an arrest rather than a stop. We hold that

the intrusive nature of the encounter did not, as a matter of law, turn the investigative stop in this case into an arrest.

■ Defendants emphasize that the stop constituted an arrest because they were made to wait in their car with hands locked behind their heads pending the arrival of other officers; defendants were made to exit their vehicle one by one and walk backwards toward the officers; defendants were handcuffed without any prior questioning or investigation; and the officers ordered them to get out of the vehicle at gunpoint.

Do the foregoing facts indicate an arrest? Prior decisions of this court have recognized that the level of intrusiveness accompanying a stop may vary depending on the facts justifying the stop. *State v. Cobbs.* The ultimate question of whether an arrest was made is whether the officers' actions in stopping the vehicle and ordering the occupants out of the car were reasonable under the circumstances. In analyzing whether an arrest occurred, we look to whether the officers' actions were reasonable under the circumstances as juxtaposed against defendants' right to be free of arbitrary interference by the officers. *Id.,* 103 N.M. at 627, 711 P.2d at 904. In some situations, officers may be required to ask the suspect questions as part of the preliminary inquiry. *See id.*

■ Even in routine traffic stops, police may adopt precautionary measures addressed to reasonable fears. *See Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). In *Mimms* the Supreme Court recognized the inordinate risks police take when they approach cars with persons seated in them, and approved the practice of requiring the persons to get out of the car and be subject to a protective frisk even in the absence of individualized suspicion.

Here, the evidence reflects that the officers had just received a report of a drive-by shooting and that minutes later they encountered and stopped a vehicle believed by them to be the one described in the broadcast. Under these circumstances, we cannot say as a matter of law that the evidence indicates the procedures employed by the officers were improper. Initially, there were only two officers on the scene and five occupants in the Impala. The occupants of the Impala were believed to be armed. On these facts, the actions of the officers in calling for assistance, and employing precautionary steps to determine whether the occupants of the Impala were armed could be found reasonable. Thus, the level of intrusion under these circumstances was not inappropriate in view of the level of danger the officers reasonably could assume to exist. *See State v. Cobbs.*

Defendants' reliance on *United States v. Strickler,* 490 F.2d 378 (9th Cir.1974), we conclude is misplaced under the facts of this case. In *Strickler* the court found police conduct in stopping a vehicle and requiring the occupants to exit the car at gunpoint to constitute an arrest. *Strickler,* however, has been eroded by later decisions from the same court, which explain the case as based on the use of excessive force under circumstances wherein the court determined there had been no threat to the safety of the officers. In *United States v. Patterson,* 648 F.2d 625 (9th Cir. 1981), the Ninth Circuit noted that *Strickler* should not be read as indicating that every forceful detention turns a stop into an arrest. Similarly, in *United States v. Taylor,* the court explained that the use of drawn guns does not automatically turn a vehicle stop into an arrest. Instead, a decision as to whether an arrest has occurred must be judged by the amount of force employed, and whether, measured by the facts and circumstances existing at the time, the actions of the officers were reasonable. Where there is reason for the officers to fear for their safety, they may unholster their guns and use reasonable force in effectuating the stop without such action automatically constituting an arrest. *Id.,* 716 F.2d at 708–09.

As observed by the court in *United States v. Henning,* 906 F.2d at 1395:

All that is needed to support an investigative detention is reasonable suspicion. * * * "[a]n investigative detention is justified where specific and articulable facts

and rational inferences from those facts give rise to reasonable suspicion that a person has committed or is committing a crime." *United States v. Espinosa,* 782 F.2d 888, 890 (10th Cir.1986).

In *United States v. Merritt,* 695 F.2d 1263 (10th Cir.1982), *cert. denied,* 461 U.S. 916, 103 S.Ct. 1898, 77 L.Ed.2d 286 (1983), the Tenth Circuit Court of Appeals considered a case similar to the one before us. In *Merritt* the police were looking for a fugitive from another state who was known to be armed and dangerous. The officers had a reasonable suspicion, based on facts known to them, that the fugitive was one of three persons in a white truck. After radioing for backup, four officers approached the vehicle with their shotguns drawn and ordered the suspects out of the car. Ultimately, there were twelve to fifteen police officers at the scene, two or three of whom were carrying shotguns at the ready. Despite the intrusive nature of the stop, the Tenth Circuit Court reversed the trial court's order suppressing evidence found in the suspects' vehicle, holding that the use of force did not turn the stop into an arrest.

In *Merritt* the court determined that law enforcement officers may employ reasonable force justified under the circumstances commensurate with the officers' need for safety. The *Merritt* court rejected the argument that a use of force by the police in conducting a stop necessarily constitutes an arrest. The court held:

It seems to us that to focus the analysis in this manner diverts attention from the court's true concern in any Fourth Amendment case—whether the police conduct, in light of all the circumstances, was reasonable. We should not ask whether the force used was so great as to render it an arrest but, instead, whether the force used was reasonable. Whenever the police confront an individual reasonably believed to present a serious and imminent danger to the safety of the police and public, they are justified in taking reasonable steps to reduce the risk [of injury]. They should not be constrained in their effort to reduce the risk of injury or death simply because the

facts known to them create a reasonable suspicion, but do not rise to the level of probable cause.

*Id.,* 695 F.2d at 1274.

Accordingly, we hold that the level of force used by the officers in effecting the investigative detention in this case did not, as a matter of law, convert the initial stop into an arrest.

## IV. OPENING THE CAR DOOR

■ Defendants contend that, even if the stop was proper, the officers exceeded the proper bounds of investigation by opening the car door and that this action effectively amounted to a search of the car. Lucero testified that he and another officer approached the car, with guns drawn, once the five occupants were out, because they were not sure whether another occupant was lying on the floor of the car. In light of the testimony that there were three people in the front seat of the car and five people got out of the car, the officers' concerns were not unreasonable. Considering the fact that it was late at night, the visibility of the officers was limited, that the officers had a reasonable basis to believe that a firearm had been discharged earlier, and believed that either the occupants were armed or that there was a possibility that there may have been weapons in the vehicle, it was not unreasonable for the officers to have opened the car door immediately upon approaching it.

■ Defendants argue that the officers should not have opened the car door, reasoning that the car windows were not tinted and the police could have merely looked in a window to determine whether another person might still be in the car. This argument, however, overlooks the expressed concern of the officers that an armed person might have been hiding in the vehicle. Under such circumstances, the police were not required to forego reasonably prudent steps necessary for their own safety. An officer looking into the vehicle window might have found himself looking down into the barrel of a gun. Under these circumstances, we cannot say that the actions of the officers were unreasonable.

**524**

Under the facts before us, the officers were entitled to take reasonable precautions to insure their safety, including the opening of the car door, and the actions which led to discovery of the shotgun were lawful. Law enforcement officers carrying out an investigatory stop are permitted to make a limited search for weapons that might be used to harm them. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *State v. Cobbs.*

The cases relied upon by defendants do not persuade us that the actions of the officer were unreasonable or that their acts amounted to an improper search and seizure. In *State v. Landry*, 393 So.2d 713 (La.1981), the court determined that any threat of harm from the suspect was neutralized once he was patted down, the officers determined the suspect had no weapons, and the suspect's bag was behind the officer. The court there determined the search to be a search for evidence. In this case, however, the officers had not yet determined that all the occupants of the vehicle had exited the vehicle. Thus, *Landry* is factually distinguishable and involved a situation in which the officer knew precisely what he was facing. Similarly, in *Hoag v. State*, 728 S.W.2d 375 (Tex.Crim. App.1987) (en banc), the court held there were no facts to support a search for weapons. In contrast, in this case, the police officers were still confronted with a potential danger.

## V. CONCLUSION

The case is remanded to the trial court for further proceedings. On remand the trial court is directed to adopt specific findings of fact relating to defendants' motion to suppress evidence, including a determination of the credibility of the state's witnesses, and for evaluation of the motion in light of the evidence and matters set forth in this opinion.

IT IS SO ORDERED.

BIVINS and CHAVEZ, JJ., concur.