5 P.2d 573

2000-NMCA-050

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Brian MADSEN, Defendant–Appellant.**

No. 20,081.

Court of Appeals of New Mexico.

April 17, 2000.

Certiorari Denied, No. 26,322,
June 8, 2000.

252

Patricia A. Madrid, Attorney General, Ralph E. Trujillo, Assistant Attorney General, Santa Fe, for Appellee.

Phyllis H. Subin, Chief Public Defender, Will O'Connell, Assistant Appellate Defender, Santa Fe, for Appellant.

## OPINION

BUSTAMANTE, Judge.

{1} Defendant appeals his convictions for unlawful carrying of a deadly weapon and trafficking cocaine. On appeal, he contends (1) the trial court erred in denying his motion to suppress evidence and (2) the judge pro tempore was improperly appointed and therefore lacked authority to preside over this case. For the reasons set forth below, we reject Defendant's contentions and affirm the judgment and sentence of the trial court.

## FACTS

{2} On August 12, 1997, Detective William Brown of the Roswell Police Department obtained a search warrant for room 115 of the Leisure Inn motel in Roswell. The search warrant authorized the search of the motel room for firearms and related evidence. The basis for the search warrant was the complaints of two victims, James Hughes and Sophia Cooper (Victims). Mr. Hughes reported that four days earlier, on August 8, Defendant chased and pointed a gun at Victims as they were driving down the street. Mr. Hughes identified Defendant in a photo array as the person who aimed a gun at Victims. Ms. Cooper complained that on August 11, Defendant grabbed and beat her in room 115 of the motel. Ms. Cooper is the former girlfriend of Defendant.

{3} The police attempted to corroborate the complaints of Victims before obtaining the search warrant. Detective Jody Scifres conducted a surveillance outside the motel room on the day the warrant was issued. At approximately 6:15 p.m., he observed Defendant drive through the parking lot of the motel, park his motorcycle in front of room 115 and enter the room. The officer ran a license plate check on the motorcycle, and it was registered in Defendant's name.

{4} At approximately 8:45 p.m., Sergeant Pennington and Detectives Brown, Scifres, and Hill drove into the parking lot of the Leisure Inn and were about to execute the search warrant when they observed Defendant talking on a pay phone in front of the motel. The pay phone was approximately 50 to 100 yards away from the motel room to be searched. Although Defendant was not observed with a firearm and did not appear to be engaged in any criminal activity, the officers decided to "make contact" with him at the pay phone for safety reasons. Detective Scifres testified that because Defendant was suspected of pointing a firearm at Victims, it was safer to approach him at the pay phone and thus avoid a possible confrontation with him later in the room as the search warrant was being executed. Detective Brown similarly testified that it was more prudent to contact Defendant out in the open than in the motel room. Sergeant Pennington testified that the officers made contact with Defendant to "talk with him."

{5} The officers pulled up to Defendant in a dark, unmarked vehicle. All four of the officers got out of the vehicle, drew their weapons, identified themselves as the police, and ordered Defendant to step away from the phone and to show his hands. The officers testified that they drew their weapons and ordered Defendant to show his hands because he was suspected of aggravated assault and was believed to be armed and dangerous. Defendant moved away from the phone but did not put up his hands. His left hand was concealed under his shirt. The officers repeatedly ordered Defendant to raise his hands, but he refused to comply and stared blankly at the officers.

{6} Finally, two officers grabbed Defendant, pushed him against the wall, and held his hands to the wall. Around this time, Defendant announced that he had a loaded gun. A loaded .45 caliber semiautomatic handgun was removed from the waistband of his pants. Defendant was then arrested for unlawfully carrying a deadly weapon and was handcuffed. He was escorted to a patrol car that had just arrived at the scene and was searched by Detectives Scifres and Brown. The officers found on Defendant two bags of cocaine, one bag of marijuana, rolling papers, $1480 in cash, a pager, and a chrome magazine with eight rounds in it.

## DISCUSSION

### Motion To Suppress

{7} Defendant moved to suppress the evidence against him on the grounds that he was unlawfully stopped, detained, and searched by the officers. The trial court denied the motion. We review the trial court's denial of Defendant's motion to suppress to determine whether "the law was correctly applied to the facts, viewing them in the manner most favorable to the prevailing party." *State v. Esquerra*, 113 N.M. 310, 313, 825 P.2d 243, 246 (Ct.App.1991). Although we review the trial court's application of the law to the facts de novo, we will not disturb "the trial court's findings of historical fact if they are supported by substantial evidence." *State v. Shaulis–Powell*, 1999–NMCA–090, ¶ 7, 127 N.M. 667, 986 P.2d 463. We indulge all reasonable inferences in support of the trial court's ruling even when the trial court did not enter any findings of fact in deciding the motion to suppress. *See* *State v. Wagoner*, 1998–NMCA–124, ¶ 16, 126 N.M. 9, 966 P.2d 176.

{8} Defendant argues that the officers lacked reasonable suspicion to stop and detain him because he was not observed committing a crime at the pay phone, and the report that he brandished a gun at Victims four days earlier did not justify an investigative stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). He also argues that the detention was not authorized under the search warrant because he was not named in the search warrant and was not in the motel room when the officers arrived to execute the warrant.

{9} This Court has observed that "in appropriate circumstances, a police officer may detain a person in order to investigate possible criminal activity, even if there is no probable cause to make an arrest." *State v. Cobbs*, 103 N.M. 623, 626, 711 P.2d 900, 903 (Ct.App.1985); *see also Terry*, 392 U.S. at 20–22, 88 S.Ct. 1868. When making an investigatory stop, the officer "must have a reasonable suspicion, based upon specific articulable facts and any rational inferences

that can reasonably be drawn from such facts, that the law has been or is being violated." *State v. Lovato*, 112 N.M. 517, 519, 817 P.2d 251, 253 (Ct.App.1991). Therefore, we determine the existence of reasonable suspicion under an objective standard: "Would the facts available to the officer warrant the officer, as a person of reasonable caution, to believe the action taken was appropriate?" *State v. Galvan*, 90 N.M. 129, 131, 560 P.2d 550, 552 (Ct.App.1977); *see also In re Jason L.*, 1999–NMCA–095, ¶ 10, 127 N.M. 642, 985 P.2d 1222. ("The existence of reasonable suspicion ... must be judged by the totality of the circumstances and the reasonable inferences ... drawn therefrom.").

{10} In this case, the officers had arrived at the motel to execute a search warrant for room 115 when they saw Defendant using a pay phone in front of the motel. The officers had information that Defendant had assaulted two victims with a firearm four days earlier and had beaten one victim in the motel room the previous day. Defendant had been identified by one of the victims in a photo array. One of the officers had also seen Defendant in the motel parking lot earlier in the evening during a surveillance of the motel room. Therefore, Defendant was a known suspect of violent criminal offenses when the officers saw him. Because of the complaints of past violent criminal activity, the officers decided to approach Defendant for safety reasons and to question him. Considering the facts and circumstances known to the officers when they saw Defendant, we conclude it was reasonable for the officers to approach Defendant to question him about the alleged crimes reported by victims.

{11} Defendant argues that the detention cannot be upheld as a *Terry* stop because he was not acting in a suspicious manner when approached by the officers. He also argues that because the complaints of Victims involved an assault that occurred four days earlier, the stop lacked the exigency required under *Terry*. We believe Defendant reads *Terry* too narrowly. The test for determining the validity of a *Terry* stop is whether the officer making the stop has reasonable suspicion, based on specific and articulable facts, "that *the law has been or is being violated*." *Lovato*, 112 N.M. at 519, 817 P.2d at 253 (emphasis added).

{12} The issue of whether police officers can make an investigatory stop for a completed, rather than an ongoing or imminent, crime was addressed by the United States Supreme Court in *United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). There, police officers stopped the suspect's vehicle almost two weeks after an armed robbery in which he had been implicated. The officers stopped him based on a "wanted flyer" issued by a police department in a neighboring state. The *Hensley* court extended the *Terry* doctrine to stops for past criminal activity, holding that "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." *Hensley*, 469 U.S. at 229, 105 S.Ct. 675. Acknowledging that exigent circumstances may not be as "pressing" when a crime has already been completed, the Court nonetheless concluded that "the strong government interest in solving crimes and bringing offenders to justice" outweighed the individual's interest to be free of a stop and detention, particularly where "felonies or crimes involving a threat to public safety" were the subject of investigation. *Id.*, at 228–29, 105 S.Ct. 675.

{13} Here, Defendant was suspected of committing aggravated assault four days before the stop. Aggravated assault, or assault with a deadly weapon, is an inherently dangerous crime and a felony. *See* NMSA 1978, § 30–3–2(A) (1963); *State v. Arredondo*, 1997–NMCA–081, ¶ 16, 123 N.M. 628, 944 P.2d 276 ("Aggravated assault, or 'assault with weapons,' is one of the inherently dangerous crimes which provide a police officer with reason to conduct a protective search."), *overruled on other grounds by State v. Steinzig*, 1999–NMCA–107, ¶ 30, 127 N.M. 752, 987 P.2d 409. Therefore, we hold that officers could properly stop and detain Defendant to investigate the report of the aggravated assault even though it occurred four days earlier.

{14} Nor can we ignore the fact that, when the officers approached Defendant, they were armed with a search warrant to search the motel room where he had been staying. In *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), the United States Supreme Court, in establishing a limited exception to the probable cause requirement, held that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Id.* at 705, 101 S.Ct. 2587 (footnote omitted); *see also State v. Graves,* 119 N.M. 89, 92–93, 888 P.2d 971, 974–75 (Ct.App.1994) (examining *Summers* in context of detention of non-resident found on premises to be searched).

{15} In *Summers,* police officers encountered the defendant as he was walking down the front steps of his house just as they were about to execute a search warrant. The officers requested that the defendant reenter the house and detained him during the search. The defendant was arrested after illegal drugs were found in his basement. The Court explained that, in light of the defendant's connection to the home, the existence of the search warrant provided "an objective justification for the detention." *Summers,* 452 U.S. at 703, 101 S.Ct. 2587. The Court also noted that a detention pursuant to the execution of a valid search warrant promotes legitimate law enforcement interests, including (1) "preventing flight in the event that incriminating evidence is found," (2) "minimizing the risk of harm to [law enforcement] officers," and (3) facilitating "the orderly completion of the search." *Id.,* at 702–03, 101 S.Ct. 2587.

{16} We conclude that the *Summers* exception applies to this case. Defendant states that he did not rent the room subject to the search warrant. However, we do not believe this fact renders the detention unreasonable under *Summers. See Graves,* 119 N.M. at 92, 888 P.2d at 974 (holding police may detain non-resident if "they have a reasonable basis to believe that the non-resident has some type of connection to the premises or to criminal activity"). Here, it is undis-

puted that the officers had information that Defendant was staying in room 115 and had beaten his former girlfriend in the room. Defendant was also seen entering the room approximately two hours before the officers arrived to execute the search warrant. Therefore, when the officers saw Defendant, they had a reasonable basis to believe he had a connection to the room and to the criminal activity reported by Victims.

{17} Moreover, detaining Defendant advanced all three of the governmental interests outlined in *Summers.* First of all, the detention served the interest of protecting the officers. The officers testified that because they saw Defendant when they arrived at the motel and suspected him of being armed and dangerous, they decided to detain him at the pay phone for safety reasons. *See* 2 Wayne R. LaFave, *Search & Seizure,* § 4.9(e), at 645–46 (3d ed. 1996) ("[T]he police, obligated to carry out the command of the search warrant, cannot simply avoid the suspect and conceal their suspicions of him, nor can they devote their undivided attention to him and make sure that once he has departed he does not return and try to forcibly thwart execution of the warrant."). Moreover, because Defendant was standing only 50 to 100 yards from the motel room, he might have been in a position to observe the officers executing the search warrant or could have become aware of the execution of the search warrant upon returning to the room. Therefore, he posed a flight risk to the officers. Lastly, by detaining Defendant, the officers could have obtained his cooperation and assistance during the search.

{18} Defendant, however, argues that the detention was unlawful because he was not in the motel room when the officers arrived to execute the search warrant. Rather, he was using a pay phone on motel grounds, approximately 50 to 100 yards from the room to be searched. We conclude that, based on Defendant's close proximity and demonstrated connection to the room, the detention at the pay phone was reasonable under the circumstances. *See Graves,* 119 N.M. at 93, 888 P.2d at 975; *see also United States v. Cochran,* 939 F.2d 337, 339 (6th Cir.1991) ("*Summers* does not impose upon police a duty

based on geographic proximity (i.e., defendant must be detained while still on his premises); rather, the focus is upon police performance, that is, whether the police detained defendant as soon as practicable after departing from his residence.").

{19} We note that when presented with similar factual scenarios, courts in other jurisdictions have upheld, under *Summers,* the detentions of persons found outside the premises to be searched pursuant to a search warrant. *See, e.g., Cochran,* 939 F.2d at 339 (concluding defendant properly detained after driving short distance from home to be searched); *Fromm v. State,* 96 Md.App. 249, 624 A.2d 1296, 1298–99, (1993) (determining police properly detained defendant who was leaving neighboring apartment building as officers arrived to execute search warrant); *State v. Ailport,* 413 N.W.2d 140, 144 (Minn. Ct.App.1987) (holding officers properly detained defendant, who was known to have violent criminal history, when he pulled into motel parking lot as officers were about to execute search warrant for room); *but see United States v. Edwards,* 103 F.3d 90, 94 (10th Cir.1996) (holding that under the circumstances stop was invalid where defendant non-resident was stopped three blocks from residence to be searched); *United States v. Sherrill,* 27 F.3d 344, 346 (8th Cir.1994) (holding warrantless stop not valid where defendant was stopped one block from house). Consistent with this line of precedent from other jurisdictions, we hold that, in this case, the stop of Defendant at the pay phone, while still on the motel compound, just a short distance from the room about to be searched, was justified under the holdings of *Summers* and *Graves.*

■ {20} Moreover, because Defendant was suspected of having committed a violent felony, the officers had legitimate safety concerns and were justified in drawing their weapons and ordering Defendant to show his hands. "Where there is reason for the officers to fear for their safety, they may unholster their guns and use reasonable force in effectuating the stop without such action automatically constituting an arrest." *Lovato,* 112 N.M. at 522, 817 P.2d at 256; *cf. State v. Jimmy R.,* 1997–NMCA–107, ¶¶ 2–3, 124

N.M. 45, 946 P.2d 648 (officer responding to call from concerned citizen about gun shots in the neighborhood was justified in drawing weapon, ordering juveniles to the ground, and handcuffing and searching juveniles).

■ {21} By ignoring the officers, refusing to show his hands, and keeping one hand under his shirt, Defendant's actions confirmed the officers' suspicions that he was armed and dangerous. Therefore, the officers were justified in grabbing Defendant and attempting to search him for weapons. *See State v. Flores,* 1996–NMCA–059, ¶ 17, 122 N.M. 84, 920 P.2d 1038 ("During an investigatory stop, when an officer reasonably believes the individual may be armed and dangerous, he or she may check for weapons to ensure personal safety ."); *see also Cobbs,* 103 N.M. at 630, 711 P.2d at 907 (noting that officer may conduct protective patdown search if there is reasonable suspicion that suspect has committed, is committing or will commit an "inherently dangerous crime"). *Arredondo,* 1997–NMCA–081, ¶ 16, 123 N.M. 628, 944 P.2d 276 (citing *Cobbs* with approval and concluding officer's protective search of defendant was justified upon reasonable belief that defendant had recently "used a handgun to commit an aggravated assault").

■ {22} Before the officers could search Defendant for weapons, however, he voluntarily stated that he had a loaded gun. At that point, the officers had probable cause to believe that Defendant was committing the crime of unlawfully carrying a deadly weapon, *see* NMSA 1978, § 30–7–2 (1985), and could arrest him, *see State v. Blakely,* 115 N.M. 466, 469, 853 P.2d 168, 171 (Ct.App. 1993). Defendant was then taken to the patrol car and was lawfully searched incident to arrest. *See State v. Garcia,* 100 N.M. 120, 126, 666 P.2d 1267, 1273 (Ct.App.1983) ("Where a warrantless arrest is valid, a reasonable search incident to the arrest also will be upheld."). Therefore, for the reasons discussed above, we hold that the stop, seizure, and search of Defendant were lawful.

## Appointment of Judge Pro Tempore

{23} Before Defendant's second trial, the Chief Justice of the New Mexico Supreme

Court appointed the Honorable James J. Wechsler, a New Mexico Court of Appeals judge, as district judge pro tempore to preside over Defendant's case. Defendant argues, pursuant to *State v. Franklin,* 78 N.M. 127, 129, 428 P.2d 982, 984 (1967), and *State v. Boyer,* 103 N.M. 655, 658–60, 712 P.2d 1, 4–6 (Ct.App.1985), that there was no basis to appoint a district judge pro tempore in this case, and Judge Wechsler was therefore without jurisdiction to preside over Defendant's second trial.

 {24} Article VI, Section 15(C) of the New Mexico Constitution provides:

> If any district judge is disqualified from hearing any cause *or is unable to expeditiously dispose of any cause in the district,* the chief justice of the supreme court may designate any retired New Mexico district judge, court of appeals judge or supreme court justice, with said designees' consent, to hear and determine the cause and to act as district judge pro tempore for such cause.

(Emphasis added.) Defendant acknowledges that the Chief Justice has broad authority to designate a judge pro tempore, including a Court of Appeals judge, to preside over a case. *See id; Vigil v. Reese,* 96 N.M. 728, 729, 634 P.2d 1280, 1281 (1981) ("The chief justice has the constitutional duty and authority to designate a judge to try a case *for any reason* when [she] determines that the public business so requires.").

{25} Here, it appears that Judge Wechsler was appointed district judge pro tempore because the then presiding judge was unable to meet the demands of his criminal docket. Article VI, Section 15(C) of the New Mexico Constitution allows the designation of a judge pro tempore if a district judge "is unable to expeditiously dispose of any cause in the district." Therefore, we determine that the Chief Justice could properly determine that the presiding judge was unable to expeditiously dispose of this matter due to his heavy criminal docket and that it was appropriate to appoint Judge Wechsler as district judge pro tempore to preside over Defendant's case. We therefore conclude that Judge Wechsler possessed proper jurisdiction, sitting as a district court judge, to decide Defendant's case.

## CONCLUSION

{26} We hold that the trial court properly denied Defendant's motion to suppress evidence. We also hold that the judge pro tempore was properly appointed. Therefore, we affirm Defendant's convictions.

{27} **IT IS SO ORDERED.**

APODACA and ARMIJO, JJ., concur.