This memorandum opinion was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**STATE OF NEW MEXICO**,

    Plaintiff-Appellee,

v.                                    **NO. 30,358**

**AARON S.,**

    Child-Appellant.

**APPEAL FROM THE DISTRICT COURT OF McKINLEY COUNTY**
**Grant L. Foutz, District Judge**

Gary K. King, Attorney General
Santa Fe, NM
Jacqueline R. Medina, Assistant Attorney General
Albuquerque, NM

for Appellee

Jacqueline L. Cooper, Chief Public Defender
Kathleen T. Baldridge, Assistant Appellate Defender
Albuquerque, NM

for Appellant

**MEMORANDUM OPINION**

**VIGIL, Judge.**

## I. Introduction

Child was adjudicated delinquent on allegations of aggravated battery and receiving stolen property, and as a result was committed to CYFD for one year. Child appeals the district court's denial of two motions to suppress evidence obtained without a warrant: one involving the stop and search of the van he was driving, and another of the subsequent search of his bedroom and a shed at his home. We affirm. Because this is a memorandum opinion and the parties are familiar with the procedural and factual background, we discuss pertinent facts within the analysis of the issues.

## II. Mootness

As an initial matter, we address the State's argument that Child's appeal is now moot, as he is nineteen years old, has completed the requirements of his disposition, and is no longer subject to CYFD custody. Generally, appellate courts do not review moot cases. *See Mowrer v. Rusk*, 95 N.M. 48, 51, 618 P.2d 886, 889 (1980). "An appeal is moot when no actual controversy exists, and an appellate ruling will not grant the appellant any actual relief." *State v. Sergio B.*, 2002-NMCA-070, ¶ 9, 132 N.M. 375, 48 P.3d 764. However, we will not withhold review if the case raises issues of substantial public interest or issues that are capable of repetition, yet evade

review. *Cobb v. State Canvassing Bd.*, 2006-NMSC-034, ¶ 14, 140 N.M. 77, 140 P.3d 498.

Child argues that his case is not moot, as the adjudication in this case will have collateral consequences in any future sentencing proceedings he may have as an adult. We noted in *Sergio B.* that collateral consequences similar to those Child has alleged would not be sufficient for an exception to the mootness doctrine in federal court, but we have yet to determine whether they are sufficient to create an actual controversy under New Mexico law. *See Sergio B.*, 2002-NMCA-070, ¶ 10; *State ex rel. Children, Youth & Families Dep't v. Amanda H.*, 2007-NMCA-029, ¶¶ 14-16, 141 N.M. 299, 154 P.3d 674.

We again do not reach the issue of whether the collateral consequences to Child are sufficient to find an actual controversy, as we determine that the issues before us are capable of repetition, yet evading review. "[A]n issue can be capable of repetition . . . even though the parties are unlikely to litigate the same issue again. It is sufficient that the issue be capable of repetition in some future lawsuit; the identity of the parties is irrelevant." *Garcia v. Dorsey*, 2006-NMSC-052, ¶ 16, 140 N.M. 746, 149 P.3d 62 (internal quotation marks and citation omitted). We held in *Sergio B.* that the short-term commitment of most juvenile dispositions can cause the evasion of appellate review on issues that will arise again in future children's cases. 2002-NMCA-070, ¶

3

11 ("Many children's court cases will involve short-term commitments of one year or less, *see* NMSA 1978, § 32A-2-19(B)(2) (1996), which could expire before the case was fully briefed before this Court or our Supreme Court, and thus these issues would evade review unless this exception was invoked.").

Likewise, here we conclude that the issues in Child's case fall under the capable of repetition, yet evading review exception to the mootness doctrine because of the short-term commitments inherent in dispositions under the Children's Code, and we will consider Child's arguments on appeal.

### III. Denial of Motions to Suppress

Child appeals the district court's denial of two motions to suppress on the grounds that the stop and subsequent search of his van, the search of his bedroom, and the search of a shed at his home were unlawful. *See State v. Cardenas-Alvarez*, 2001-NMSC-017, ¶ 17, 130 N.M. 386, 25 P.3d 225 ("The exclusionary rule requires suppression of the fruits of searches and seizures conducted in violation of the New Mexico Constitution."). On appeal from a district court's ruling on a motion to suppress, findings of fact are reviewed to determine if they are supported by substantial evidence and legal conclusions are reviewed de novo. *State v. Leyba*, 1997-NMCA-023, ¶ 8, 123 N.M. 159, 935 P.2d 1171. "Since the trial court is in a better position to judge the credibility of witnesses and resolve questions of fact, the

factual analysis should be viewed in a light favorable to the prevailing party." *State v. Garcia*, 2005-NMSC-017, ¶ 27, 138 N.M. 1, 116 P.3d 72. We review the whole record in determining whether there was support for the search or seizure. *See State v. Martinez*, 94 N.M. 436, 439, 612 P.2d 228, 231 (1980).

**A.     Stop of the Van**

Child argues that the stop of his van was not supported by reasonable suspicion, or alternatively, was a de facto arrest and not supported by probable cause. The district court denied Child's motion to suppress evidence seized from the van on the ground that officers had reasonable suspicion to stop the minivan based on a briefing they had received that same day. We review the relevant facts for context.

Officers were briefed the morning of March 3, 2009, that a black Cadillac and tan van were suspected to be connected to a recent string of burglaries in Gallup's Mossman subdivision. Around 11:00 a.m. that same morning, Karrie Abeyta went to her home in the Mossman subdivision to find that her home had been burglarized and called 911 immediately. Christian Silva, Mrs. Abeyta's neighbor, testified that he left his home to go to the gas station around 11:00 a.m. that morning, and during the twenty-five minutes he was gone, he received a call that Mrs. Abeyta's home had been burglarized. Upon returning home shortly thereafter, he discovered that his home had also been burglarized.

5

At 11:18 a.m., officers were dispatched to Mrs. Abeyta's home regarding the possible burglary. Two different sets of officers in different patrol cars testified that they observed a tan van leaving the Mossman subdivision as they were responding to the burglary. One officer also stated that she and another officer saw a black Cadillac in the Mossman area before seeing the tan van. Another officer, who was a passenger in an unmarked patrol unit, testified that he also saw the tan van and it was driving "a little fast for being in a neighborhood" and that all of the occupants of the van "took notice" of the car and that one occupant turned and watched the car after they passed, facts that he found unusual.

Testimony was introduced that the officers arrived at the scene at 11:25 a.m. After the two sets of officers arrived at the scene, it was determined that a burglary had likely occurred. The two sets of officers discussed both seeing the van, and at 11:40 a.m., a decision was made to put an "Attempt to Locate" (ATL) on a tan or gold colored van, possibly a Windstar, to investigate its possible connection to the burglary. Officer Bowman located the van pursuant to the ATL in Gallup at 12:01 p.m. and initiated a "felony stop."

"[A]n officer making an investigative stop must have a reasonable suspicion, based upon specific articulable facts and any rational inferences that can reasonably be drawn from such facts, that the law has been or is being violated." *State v. Lovato*,

112 N.M. 517, 519, 817 P.2d 251, 253 (Ct. App. 1991). Child argues on appeal that the officers lacked the individualized suspicion that he had been involved in criminal activity required to support the investigatory detention that resulted from the felony stop. *See City of Roswell v. Hudson*, 2007-NMCA-034, ¶ 18, 141 N.M. 261, 154 P.3d 76 ("If a police officer lacks individualized suspicion, 'the government's interest in crime prevention will not outweigh the intrusion into the individual's privacy' and the detention violates the Fourth Amendment." (quoting *State v. Patterson*, 2006-NMCA-037, ¶ 16, 139 N.M. 322, 131 P.3d 1286)).

Child relies on *Hudson* to support his argument that there was insufficient individualized suspicion to support the investigatory stop. 2007-NMCA-034. In *Hudson*, we held that there was not sufficient individualized suspicion of criminal activity where officers observed the defendant in a parked car for thirty minutes at night on a street in proximity to the site of recent burglaries. *Id.* ¶¶ 18-19. Here, however, Child was driving a van which matched a description given at a briefing that morning involving burglaries in the area. Further, the van was seen leaving the general area of a reported burglary within a time period of seven minutes after its report, and one officer testified that there were suspicious characteristics about his driving. Thus, we determine that this case is distinguishable from *Hudson*, in that there were identifying characteristics of the vehicle matching the briefing regarding

burglaries in that area, and the vehicle was seen leaving that same area under suspicious circumstances while officers were responding to the report of another burglary. *See Lovato*, 112 N.M. at 519, 817 P.2d at 253 (holding that an investigative stop was proper where police saw a white "Impala" model vehicle leaving an area minutes after a dispatch went out regarding a drive-by shooting near that area from a white Impala vehicle).

Child argues that there was not individualized suspicion as there were three different exits from the Mossman subdivision, the van was not using the fastest route out of the subdivision, and there was other traffic in the area that morning. However, there are many different rationales for the route the van could have been taking, and the other traffic does not dispel the similarity of the van to the description given in the briefing. Thus, we determine that these facts do not negate the officers' reasonable suspicion.

Child alternatively argues that even if the officers had reasonable suspicion to stop the van, the warrantless "felony traffic stop" of the van was a de facto arrest, requiring a showing of probable cause. After the van was pulled over, Officer Bowman initiated a "felony stop" which he testified is a procedure for officer safety when the occupants of a vehicle might be armed or dangerous. Officer Bowman testified that he initiated the "felony stop" because he had been told that weapons had

been taken in the Mossman burglaries and to be careful because the suspects in the van could be armed.

Officer Bowman was alone in his police car when he initiated the stop of the two occupants he could see in the minivan. As is procedure for a "felony stop," he drew his weapon, remained at his patrol unit and announced directions to the occupants of the van over an intercom device. Two other officers joined him and also drew their weapons during the stop. At some point, four other officers also joined the scene, although it is unknown whether they drew their weapons. Child was instructed to place the keys on the roof of the vehicle, and the occupants of the van were told to keep their hands out of the windows where officers could see them. The occupants of the van were instructed one at a time to walk backwards towards the officers, lift their shirts and turn in a circle, and then were told to lie on the ground with their arms out. After they were on the ground, they were handcuffed and patted down.

After ensuring that the two occupants they could see were controlled and no longer a danger, Officer Wright testified that he and other officers inspected the interior of the van to ensure that no individual was hiding with a weapon because they had originally seen three occupants in the vehicle when passing the minivan earlier in the day. During this inspection, Officer Wright testified that the officers observed items that the officers were not sure should be in the van, including: a skill saw sitting

on the seat, a homemade dolly for moving heavy objects, and a Louis Vuitton purse with a storage box. Officer Wright specifically testified that the Louis Vuitton purse was in plain view. He testified that after the officers determined that there were no other occupants in the van, the officers closed up the van, and had it towed to the sally port at the police station where it was sealed with evidence tape, and a search warrant was obtained for the van. Detective Yearley also stated that when the van arrived at the police station, the Louis Vuitton purse was in plain view in the back of the van, not in a trunk or covered up.

"When a detention exceeds the boundaries of a permissible investigatory stop, it becomes a de facto arrest requiring probable cause." *State v. Flores*, 1996-NMCA-059, ¶ 15, 122 N.M. 84, 920 P.2d 1038. However, the ultimate question of whether an arrest was made depends on "whether the officers' actions were reasonable under the circumstances as juxtaposed against defendants' right to be free of arbitrary interference by the officers." *Lovato*, 112 N.M. at 522, 817 P.2d at 256. "Where there is reason for the officers to fear for their safety, they may unholster their guns and use reasonable force in effectuating the stop without such action automatically constituting an arrest." *Id.* To determine whether an investigatory stop is invasive enough to constitute an arrest, we look to the length of the detention, the place of detention, and the restriction on the defendant's freedom of movement, while

10

balancing the government's justification for the intrusion. *See State v. Werner*, 117 N.M. 315, 318, 871 P.2d 971, 974 (1994).

Here, Child was restrained by being held at gunpoint, handcuffed, and patted down. However, we have held that burglary is "an inherently dangerous crime for which officers may assume that a suspect is likely to be armed." *State v. Barragan*, 2001-NMCA-086, ¶ 13, 131 N.M. 281, 34 P.3d 1157. Furthermore, the officers had reports that firearms had been stolen in the burglaries in the Mossman area, including from one of the homes burglarized that morning and that firearms might be in the van. These circumstances were sufficient to justify the officers drawing their weapons and taking steps to ensure that the suspects were unarmed in effectuating the stop for reasons of officer safety. *See Lovato*, 112 N.M. at 522, 817 P.2d at 256 ("'Whenever the police confront an individual reasonably believed to present a serious and imminent danger to the safety of the police and public, they are justified in taking reasonable steps to reduce the risk [of injury]. They should not be constrained in their effort to reduce the risk of injury or death simply because the facts known to them create a reasonable suspicion, but do not rise to the level of probable cause.'" (quoting *United States v. Merritt*, 695 F.2d 1263, 1274 (10th Cir. 1982)).

Thus, we determine that substantial evidence was presented supporting a reasonable suspicion, and the district court properly applied the law to the facts in

11

determining that the stop and the level of force used by the officers was reasonable under the circumstances of this case. We therefore affirm the district court's finding that the stop was justified by reasonable suspicion alone.

**B.    Search of the Van**

Child also argues that the warrantless search of the van at the scene of the stop was unlawful. Conflicting evidence was before the court regarding the extent of a search of the van at the scene. The testimony suggested that the van may have been preliminarily searched at the scene by officers, although there is no indication that any evidence was seized at that time or removed from the van.

The search warrant affidavit stated that Officer Bowman requested consent to search the van on the scene and that a Louis Vuitton purse, four shotgun shells, and a circular saw were found pursuant to that search. However, Officer Bowman testified that he did not search the van at the scene, nor did he recall asking for consent to search the van. No testimony or evidence was presented that consent was requested or granted to search the van at the scene, outside of the statement in the search warrant.

Detective Yearley did not know if the officers searched the vehicle at the scene, and he stated that the policy at the department is that officers may "peer in" to a vehicle for items in plain view, but the search should go no further. Officer Wright

12

testified at the jury trial that he and other officers looked in the van at the scene of the stop to see if there were any occupants hiding, and they saw a skill saw, a homemade dolly for moving heavy items, and a box with a Louis Vuitton purse. *See State v. Martinez*, 94 N.M. at 439, 612 P.2d at 231 (allowing review of the entire record on appeal from a motion to suppress). It is undisputed that the van was transported to the police station, where it was sealed with red tape, and a search warrant was obtained to search the van.

There is no indication that evidence was seized from the van at the scene. Child's only contention appears to be that the evidence the officers observed upon their search of the van was wrongfully used in obtaining the search warrant. In this case, the evidence supports a conclusion that when the officers first saw the vehicle, there were three occupants in the vehicle, but only two exited. Similar to the officers in *Lovato*, we determine that under these circumstances, the officers "were not required to forego reasonably prudent steps necessary for their own safety. . . . [W]e cannot say that the actions of the officers were unreasonable. Under the facts before us, the officers were entitled to take reasonable precautions to insure their safety, including the opening of the car door." *Lovato*, 112 N.M. at 524, 817 P.2d at 258. We conclude that the actions of the officers that led to the discovery of the items listed

in the search warrant were lawful. Consequently, we hold that the court properly denied Defendant's motion to suppress.

Child points to no evidence that was actually seized at the stop with the exception of the towing of the van to the police station, which we have held is a reasonable course of action while obtaining a search warrant. *See State v. Gomez*, 1997-NMSC-006, ¶ 43, 122 N.M. 777, 932 P.2d 1 ("It would have been reasonable- and perhaps preferable-for [the officer] to have refrained from searching the vehicle and closed containers within it until after it was impounded, at which point he could have obtained a warrant."). The officers subsequently obtained a search warrant for the van, and they inventoried the contents of the van.

**C.     Search of the Home And Attachments**

Child's Mother consented to the warrantless search of Child's bedroom and a shed unattached to their home by signing a search waiver. Child contends that these searches were invalid because Child's Mother did not have authority to grant third-party consent to the search.

"A search and seizure conducted without a warrant is unreasonable unless it is shown to fall within one of the exceptions to the warrant requirement." *State v. Diaz*, 1996-NMCA-104, ¶ 8, 122 N.M. 384, 925 P.2d 4. "A valid consensual search has been acknowledged as an exception to the warrant requirement. Consent to a search

may come from not only the owner of the property, but also from a third party who has common authority over that property." *Id.* ¶ 9 (internal citations omitted). Mere ownership of property is not sufficient to entitle an individual to give third-party consent to a search of the property; rather, the party consenting must have common authority regarding the area searched. *See State v. Hensel*, 106 N.M. 8, 10, 738 P.2d 126, 128 (Ct. App. 1987), *overruled on other grounds by State v. Rivera*, 2008-NMSC-056, ¶ 22, 144 N.M. 836, 192 P.3d 1213. "In this context, common authority is defined as mutual use of the property by persons generally having joint access or control for most purposes." *State v. Ryan*, 2006-NMCA-044, ¶ 29, 139 N.M. 354, 132 P.3d 1040 (internal quotation marks and citation omitted). In addition, "[a] third party cannot consent to a search of a part of the premises within defendant's exclusive use and control." *State v. Johnson*, 85 N.M. 465, 467, 513 P.2d 399, 401 (Ct. App. 1973).

As an initial matter, Child alleges that the State did not provide a proper foundation to introduce the search waiver without Child's Mother's testimony at the suppression hearing establishing that she signed the waiver. However, Detective Yearley testified at the suppression hearing that he was present when Mother agreed to sign the waiver. Hearsay is admissible in suppression hearings. *Rivera*, 2008-NMSC-056, ¶ 15. Because Detective Yearley testified that he saw and heard Mother

give consent to the search, we determine that the waiver was properly authenticated and considered at the suppression hearing. *See* Rule 11-901(B)(1) NMRA (providing that testimony by a witness with knowledge that a matter is what it is claimed to be is a proper form of authentication).

**1.    Shed**

The district court determined that the search of the shed was valid as Mother had control over the shed. Detective Yearley testified that Mother unlocked the shed with a key to which she had access and stated that she did not think that Child would be messing around in the shed. We are satisfied that the district court properly applied the law to the facts presented at the hearing and that the search of the shed was proper, as the evidence clearly shows that Mother had both control and access to the shed.

**2.    Child's Bedroom**

Child relies on *Diaz*, in which our Supreme Court held that the state failed to establish that a parent had authority to consent to the warrantless search of his twenty-nine-year-old son's bedroom to assert that his mother's consent to the search of his bedroom was also invalid. 1996-NMCA-104, ¶¶ 4, 14.

In *Diaz*, the Court concluded that the state failed to show that the parent had joint access and mutual use of the adult defendant's bedroom. *Id.* ¶ 14. However, the Court specifically stated that it was not reaching the issue of whether a parent could

16

consent to the warrantless search of a minor child's bedroom. *Id.* In a previous New Mexico Supreme Court decision, the Court held that a mother's consent to a search of the entire home was valid when her two sons were suspected for kidnapping and armed robbery. *See State v. Williamson*, 78 N.M. 751, 752, 754, 438 P.2d 161, 162, 164 (1968). The police seized a pair of one of the sons' boots from the home pursuant to their mother's consent to the search, and the boots were used by the victims to identify one of the suspects as a perpetrator of the crime. *Id.* at 753, 438 P.2d at 163. The suspects in *Williamson* were referred to as "boys," but their age was not disclosed in the opinion, only that the "'boys', were single and living with their parents in their parents home." *Id.* at 754, 438 P.2d at 164. Furthermore, the location of the boots in the home was not discussed; however, the mother gave consent to the officers' search of the whole home. *Id.* The Court determined that "[v]oluntary consent was proved by clear and positive evidence and was uncontradicted," and cited to a case from California that determined that evidence was admissible after it was found pursuant to a mother's consent to the warrantless search of a defendant's bedroom. *Id.* *Diaz* did not discuss, distinguish, or overrule *Williamson*. *See Diaz*, 1996-NMCA-104.

We determine that under these facts and based on New Mexico precedent, Child's Mother had actual authority to consent to the search of Child's bedroom.

17

Evidence established that Child's Mother was his guardian and responsible for Child, Child was a juvenile at the time of the search, and no evidence was presented that Mother was restricted from Child's bedroom in any way. The relationship between a minor child and a parent indicates more control and rights of access to the minor child's bedroom in a home of which the parent is the guardian, distinguishing this case from *Diaz*. Thus, we conclude that Child's Mother had actual authority to consent to the search of Child's bedroom based on the parent-child relationship.

**IV.    Conclusion**

Having determined that the district court did not err in denying Child's motions to suppress, we affirm

**IT IS SO ORDERED.**

_____
**MICHAEL E. VIGIL, Judge**

18

**WE CONCUR:**

_____

**CELIA FOY CASTILLO, Chief Judge**

_____

**MICHAEL D. BUSTAMANTE, Judge**