1999-NMCA-131

991 P.2d 517

**Stephanie Rae BOUTZ, a/k/a Stephanie B. Donaldson, Petitioner–Appellee/Cross–Appellant,**

v.

**Stephen R. DONALDSON, Respondent–Appellant/Cross–Appellee.**

**No. 19,450.**

Court of Appeals of New Mexico.

Sept. 20, 1999.

Cynthia A. Fry, Albuquerque, William N. Henderson, The Henderson Law Firm, Albuquerque, for Appellee/Cross–Appellant.

Kim E. Kaufman, Albuquerque, Donald R. Westervelt, Albuquerque, for Appellant/Cross–Appellee.

## OPINION

BOSSON, J.

{1} Stephanie Rae Boutz (Mother) moved for and was granted an increase in child support from Stephen Donaldson (Father) after an evidentiary hearing before a court-appointed special master, followed by formal objections, briefing, and legal arguments to the trial court. The special master had been appointed, without any objection, to take evidence and make a report. As part of its order appointing the special master, the court indicated it would accept the report unless "clearly erroneous," and that standard of review was not challenged below nor on appeal. The court entered findings and conclusions that adopted almost all the recommendations in the special master's report, and the court then issued an order significantly increasing Father's child-support obligation. Father appeals the increase in child support as well as certain other aspects of the court order. Mother cross-appeals one aspect of the court order, in which the court declined to follow the special master's report, regarding how to compute Father's income from tax-exempt bonds. For the most part, we affirm the trial court's decision to adopt a portion of the special master's report, and we also affirm the court's decision not to adopt that portion of the report relating to the computation of Father's income. In certain particulars described more fully hereafter, we are persuaded by Father's argument on appeal, and to that extent we reverse and remand for further proceedings.

{2} Initially, we review whether, based on the evidence before the trial court of Father's increased income, the court correctly determined that circumstances had substantially changed in a manner materially affecting the welfare of the children and sufficient to modify the original child support order. See NMSA 1978, § 40–4–11.4 (1991). Under the original order, Father paid child support at the rate of $3000 per month. Based upon evidence presented to the special master, the

court determined that child support should be increased to $4904 per month. In addition, Father was ordered to continue paying tuition for the children's private schooling at the same rate of $1250 per month. Under Section 40–4–11 .4, a change in circumstances is presumed sufficient to justify modifying child support if the new circumstances "would result in a deviation upward or downward of more than twenty percent of the existing child support obligation." An increase in the basic, monthly child support of $1904 from a previous monthly support of $3000 is an increase that easily exceeds 20%. Even if we were to factor in the monthly tuition payments of $1250, which Father continues to pay after the modification order, the percentage increase might be altered, but not the result. The "deviation upward" would still exceed 20% by a significant margin over the payments that Father was previously obligated to make. Therefore, based on the amount of the proposed increase, as compared with what Father was previously paying, we conclude that the change in circumstances is sufficient in an amount to justify a court-ordered modification of child support.

{3} We now turn to the court's income determinations for Father and Mother for the sample year 1996 that produced such a significant increase in child support. With respect to Mother's income, Father maintains that Mother was underemployed and that the court should have imputed a higher, potential income based on her proven capacity to earn money. *See* § 40–4–11.1(C)(1) (" 'income' means ... potential income if unemployed or underemployed"). Mother appears to have earned less than she otherwise might have during 1996 and the four previous years because she bought a bookstore and tried unsuccessfully to make it a going concern. The doors were closed in mid–1996, and the assets were liquidated. Mother had to liquidate certain savings and investments during that time due to expenses connected with the business, and she purchased a house for her family that required substantial, expensive remodeling to provide suitable living space for the children. Father requested that additional income be imputed to Mother based on (1) her acknowledged

potential to earn more consistent with her earning capacity, and (2) additional investment income she would have earned if she had not liquidated part of her savings to meet the demands of the business and her new house.

{4} In rejecting these arguments, the special master specifically found that "both parties are acting in good faith in their respective employment endeavors and both have taken reasonable steps to provide support for their children." The special master also found that neither party presented sufficient evidence "to substantiate and quantify" their claims of in-kind income from financial arrangements regarding their respective homes, and therefore, "neither parties [sic] financial arrangements with regard to their home should be considered in determining income for child support purposes." The special master concluded that the record did not support Father's request "to impute income to Mother that she does not earn at this time." The trial court adopted these findings verbatim.

{5} Father attacks the court's refusal to impute income as an abuse of discretion and unsupported by the record. We disagree. Father cites no legal authority that would require the court to impute income to Mother, and we know of none. The imputation of income depends on the evidence and the sound exercise of judicial discretion. There was evidence that Mother made reasonable, good faith efforts to succeed in her business, including consulting with experts who gave her reason for optimism. There was evidence that Mother moved into newer housing to secure a safe, suitable neighborhood in which to raise young children. The only house she could find needed capital improvements to provide space for the children.

{6} It is for the trial judge, or in this case the special master, subject to judicial review, to assess Mother's efforts, sincerity, conscientiousness, and credibility, and then to decide whether Mother has acted in good faith to earn and preserve as much money to support her children as could reasonably be expected under the circum-

stances. The judge as fact finder also assesses the reasons behind large expenditures of assets, such as Mother's purchase and remodeling of this house. As this court has previously stated, "the trial court [is] entitled to consider potential as well as actual, present income." *Talley v. Talley,* 115 N.M. 89, 91, 847 P.2d 323, 325 (Ct.App.1993). Here, both the trial court and the special master heard or reviewed the evidence pro and con, and each determined that this was not a case that called for imputing additional income to Mother. As interpreted by Father, the record might have supported a contrary result, but the record does support the conclusion reached. This kind of close decision is the very essence of judging, and we will not disturb it on appeal just because the court could have reached, but was not required to reach, a different result. The trial court was within its discretion not to consider Mother underemployed by virtue of her reasonable—yet unsuccessful—efforts to establish a profitable business, and reasonable efforts to provide a home for her children. We affirm the court's decision not to impute additional income to Mother during the time leading up to the close of her business in mid–1996.

{7} Father also claims the court should have imputed to Mother additional income that she could have earned during the second half of 1996 after the business closed. However, as we read the special master's report, the court's findings and conclusion, and the transcript of the hearing before the special master, we believe Father's argument is based on a false premise because the court did essentially what Father requests. The record shows that after the book business closed, Mother used her client contacts to perform book-buying services for business, educational, and governmental entities. The record further shows that the court used the income from those efforts to project a monthly income for Mother for the rest of the year. The court, in effect, imputed to Mother a continuation of that income for the rest of the year. Contrary to Father's charge, the court did not relieve Mother of her continuing obligation to support herself and her children after her business closed.

{8} On the other hand, the court did decline to impute to Mother any continued receipt of interest from a personal loan she had previously made to the business to keep it in operation. Father maintains there is no direct evidence in the record that these interest payments (unlike earnings from the business) actually ceased after mid–1996. Apparently, the record is as Father describes it. However, both the special master and the trial court appear to have reasonably inferred from the undisputed fact that the business closed in mid–1996 that the business had no further income with which to continue paying interest. *See Jurado v. Jurado,* 119 N.M. 522, 526, 892 P.2d 969, 973 (Ct.App. 1995) (explaining that a reviewing court will make all reasonable inferences from the evidence to support the judgment below). Mother testified that she liquidated everything from the store except some bookcases and that all revenues went into the bookstore to pay suppliers. In the absence of any contrary evidence from Father, the court properly inferred from the undisputed fact of a failed business that interest payments likely terminated, simultaneously with the demise of the revenue source for those payments.

{9} Father initially challenged more than one aspect of how the court computed his own income for 1996. However, during briefing to this Court Father conceded all but one point regarding the method used for calculating his income. Father does continue to challenge how the court computed his dividend income for 1996. More specifically, Father argues that the court mistakenly rejected evidence of what Father actually received from dividends during the first half of 1996 (to be projected over the rest of the year), and used instead what Father had earned a year earlier in 1995. The court relied on 1995 figures, instead of first-half 1996 figures, despite evidence from Father's financial advisors that his dividend investments changed from year-to-year. The court did not explain its choice in this matter or its reliance on what was arguably stale information. In her brief to this Court, Mother does not support the trial court's choice of 1995 data, other than to claim no prejudice to Father.

{10} We conclude that the court's use of 1995 dividend earnings was error. Use of income from other than the year in question (1996) contradicted findings of both the special master and the court that "[t]he determination of income for purposes of computing child support should be based on current income as determined from the evidence presented at the hearing." Compounding the error, the court based Mother's income projections upon more recent data from 1996. Calculating Mother's and Father's dividend earnings by different methods violates one of the express goals of the statute: "mak[ing] awards more equitable by ensuring more consistent treatment of persons in similar circumstances." Section 40–4–11.1(B)(2); *see Talley*, 115 N.M. at 91, 847 P.2d at 325. We reverse on this point and remand for revised calculation of Father's dividend income for 1996 based upon 1996 information.

{11} Turning to the expense side of the ledger, Father claims error in the court's refusal to allow him to deduct from his income $50,000 worth of fixed overhead expenses he incurred during 1996. Mother does not dispute that Father incurred these expenses during 1996 in the course of his business as a successful author. The court rejected the expenses because Father's 1996 earnings were all from previous writings; he was not engaged in writing during 1996 and had no income from current literary efforts during that year. The court expressed concern that there might not be any future writings or that future income might not be available to support the children throughout their age of minority. The court concluded that this was an expense related to future income, not present income, "that may never occur," and was therefore "not appropriate" to deduct.

{12} The statute defines "gross income" from self-employment as "gross receipts minus ordinary and necessary expenses required to produce such income," but gross income "do[es] not include expenses determined by the court to be inappropriate for purposes of calculating child support." Section 40–4–11.1(C)(2)(b). We are not persuaded that the court's conclusion of "inappropriateness" is sufficiently supported either by

evidence in the record or by the plain meaning and purpose of the statute.

{13} There was ample testimony as to the professional need for this kind of recurring overhead expense, even when Father was not actually writing. During 1996, Father was resting from prior creative, and lucrative efforts, but he had recurring, overhead expenses nonetheless. There was no evidence to the contrary. There was no evidence in the record that Father would not be writing again or earning money from such efforts, although the amount of projected earnings from such future efforts was subject to much debate. Even Mother allowed for Father's 1996 fixed overhead expenses when she submitted requested findings of fact to the special master. Mother's change of position to the court below on this issue, and to this Court, appears to be a late conversion.

{14} Mother now urges a narrow interpretation of the statute that would allow a deduction of only those expenses that are required to produce one's current income. We disagree. The definition of gross income in the child support guidelines represents a legislative effort to estimate "actual cash flow," that is, the amount of money that will actually be available to support the children. *See Major v. Major*, 1998–NMCA–001 ¶ 9, 124 N.M. 436, 952 P.2d 37 (explaining that a self-employed parent's "actual cash flow" for child support purposes is the money "reasonably available to apply toward the support of his [or her] children"). Technical definitions that run contrary to this central purpose are disfavored. *See Leeder v. Leeder*, 118 N.M. 603, 607, 884 P.2d 494, 497 (Ct.App.1994) ("[T]he statute is not adopting some peculiar definition of 'income' that is alien to common usage."). "[O]rdinary and necessary" business expenses are deducted from gross income presumably because gross figures would not be an accurate estimate of money actually available for child support. *See* § 40–4–11.1(C)(2)(b). Here, there is no question that this business expenditure decreased the amount of Father's gross income actually available for child support. Thus, allowance of this type of deduction in this instance is consistent with the statute's purpose. The kind of dollar-for-dollar match

between income and expenses urged by Mother would lead to income distortions that would prove unreliable for purposes of calculating a reasonable child support obligation.

{15} Accordingly, the court was obligated to allow Father to deduct this type of expense as one "required to produce such income" under the statute. We reverse and remand on this point. The court on remand should consider how much of the $50,000 Father can deduct, and it should enter findings explaining why either the full amount or a portion less than the full amount is deductible. For example, if the court were to determine that a portion of the overhead expense would not likely produce income during the children's minority, then only part of the expense might be justified as a deduction. *Cf. Kamm v. Kamm,* 67 Ohio St.3d 174, 616 N.E.2d 900, 903 (1993) (explaining that to support a deviation from child support guidelines, a court may consider the proximity in time of the acquisition of a capital asset to the date of termination of the child support obligation). There may be other instances that justify a deviation so as not to allow Father to deduct the entire amount during the current year.

{16} Father next contends that the court erred by continuing his obligation of $1250 per month for his children's private school education. The court included this amount as an "extraordinary educational expense" under Section 40–4–11.1(I)(2), and gave him credit in a manner that reduced his monthly child support payment under the guidelines. It is not altogether clear how Father maintains the court committed reversible error. Father acknowledges his original agreement with Mother to pay for private school tuition. He appears to argue that this additional obligation should have been grounds for the court to deviate downward from the child support guidelines in computing his basic support obligation. *See* NMSA 1978, § 40–4–11.2 (1995). Alternatively, Father contends that his basic child support, as modified, is now so high that Mother should pay the tuition bills. We are not persuaded. Under either scenario, the statute authorizes the court to consider private school tuition in exactly the manner the

court did in this instance. The child support guidelines constitute a "rebuttable presumption" from which the court may choose to deviate under certain circumstances in the sound discretion of the court, but the court is not required to do so. *See* § 40–4–11.1(A). Father cites no authority for such a proposition, or for anything but the unremarkable assertion that the court could have deviated from the guidelines but did not have to. *See Leeder,* 118 N.M. at 603, 884 P.2d at 494 (discussing departure from guidelines). We see no abuse of judicial discretion. *See Styka v. Styka,* 1999–NMCA–002, ¶ 47, 126 N.M. 515, 972 P.2d 16 (holding that the trial court did not abuse its discretion by ordering payment of private school tuition as an extraordinary educational expense).

{17} Father also challenges the court's refusal to allow him to substitute his SEP retirement account for a declining term life insurance policy as a means of securing his future child support obligations. We agree with Father on this point as well. The court did not explain its rationale for rejecting the proposal other than jurisdictional concerns once the children passed the age of 19. However, in this instance Father was willing to obligate the SEP and make his children beneficiaries until his children reached the age of 21. While the court may not have had the jurisdictional power to compel Father to secure payments until age 21, if Father had protested, Father's concurrence appears to obviate the problem. Substitution of the SEP could be made an express, binding condition that relieves Father of his continuing obligation for life insurance premiums. Mother's insistence on Father making the children irrevocable beneficiaries of the SEP, even past age 21, appears arbitrary and unreasonable, and it is unsupported in Mother's answer brief. Accordingly, in the absence of any other rationale, we believe the court abused its discretion by not considering the merits of Father's proposal, and we remand for that purpose. Any future reasons for rejecting the SEP proposal should be explained in findings of fact.

{18} Father also challenges as an abuse of discretion the court's use of Schedule A instead of Schedule B to compute child

support. Schedule B applies only in instances of "shared responsibility," which according to Section 40–4–11.1(D)(3), only applies to situations in which the child spends at least 35% of the year "in each home," and the court found that Father failed to demonstrate that he met this qualification. Father appeals, contending that it was an abuse of discretion not to credit him with the time the children spent in school immediately after being at Father's home when Mother automatically got credit for similar school time. But the statute does not refer to constructive presence or who had the child last. The statute focuses on the time spent "in each home," and Father was unable to demonstrate this qualification unless the court counted time when the child manifestly was not in his home. Mother, on the other hand, exceeded the 35% statutory minimum even if time were not credited to her when the children were at school. Thus, there was no disparate treatment. The statute also speaks in terms of "twenty-four-hour-days," for purposes of computing shared responsibility. *See* § 40–4–11.1(G). Evidently, the court decided not to count as a "twenty-four-hour-day" the little time spent with Father before leaving for school in the morning.

{19} The 35% statutory minimum is one method chosen by the Legislature to estimate when responsibility for children is shared sufficiently to alter the child support calculation. Even at best, this is only an approximation. In this case, there is no dispute that each child spends considerably more time in the physical custody of Mother than Father. Father conceded that "there's no question that [Mother] is the primary custodian, and I honor that fact." The only question is whether the children are with Father fractionally more or less than the minimum of 35%, depending on the method of calculation. The court required Father to prove that he exceeded 35% according to a method that finds support in the statute. He could not do so. If Father could not prove that the children spent more than 35% of their time with him, then the court did not abuse its discretion. "When there exist reasons both supporting and detracting from a trial court decision, there is no abuse of discretion." *Talley*, 115 N.M. at 92, 847 P.2d

at 326. Father cites no case law to support his argument that the court abused its discretion, and we are not persuaded that the court erred.

■ {20} As his final point, Father contends that the court acted in violation of the Federal Copyright Act, 17 U.S.C. § 201 (1994), when it included Father's earnings from copyrighted works as part of his overall income for purposes of calculating child support. Father bases his claim of error on a theory of federal preemption. The Act provides that a copyright "vests initially in the author," 17 U.S.C. § 201, and cautions that copyrights "are governed exclusively" by the Act and not by "the common law or statutes of any State," 17 U.S.C. § 301(a) (1994). Father points to language in Section 201(e) of the Act that states may not "seize, expropriate, transfer, or exercise rights of ownership with respect to the copyright." Even though Father consented in his original marital settlement agreement to include his copyright income for purposes of child support, he now reverses field, arguing that federal law precludes the State from any similar action in the future. Although Father concedes that his theory of preemption is not explicit in the statute, he relies on these Congressional expressions as an indication of Congressional intent to preempt the field.

{21} We find Father's argument novel but not persuasive. Significantly, Father cites no case law in his favor directly on point, and we have not located any. Father does make general reference to federal preemption case law and particularly to *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979), in which the United States Supreme Court held that California's community property laws were preempted by the federal Railroad Retirement Act because that act vested ownership of retirement benefits exclusively in the employee spouse. But *Hisquierdo* did not involve the Copyright Act. On the other hand, the one case almost directly on point that does involve the Copyright Act supports Mother, not Father.

{22} In *Worth v. Worth*, 195 Cal.App.3d 768, 241 Cal.Rptr. 135, 139 (1987), the author-spouse contended that income from

copyrighted material could not be divided equally under California's community property law for fear of conflicting with the preemptive intent of the Copyright Act. The California appeals court disagreed, distinguishing *Hisquierdo* and the other cases cited by Father on the basis that the Copyright Act does not expressly make a copyright the exclusive separate property of one spouse. *See id.* Rather, the Copyright Act provides for co-ownership as well as transfer of all or part of a copyright even by operation of law. *See id.* at 139–40; *see also* 17 U.S.C. § 201(d)(1). The court concluded that the Act preempted only specific state copyright laws, not more general state laws concerning domestic relations, child support, or community property law. *See* 17 U.S.C. § 301(b)(1) ("Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to ... subject matter that does not come within the subject matter of copyright."). The California court held that income from a copyrighted work could be divided under state community property laws. *See Worth,* 241 Cal. Rptr. at 140.

{23} Our case does not go even as far as dividing the copyright as community property, or dividing copyrighted works, or even the income from the sale of such works. The trial court only included such income, as it passes unencumbered to Father, for purposes of calculating Father's ability to support his children. In short, the court's actions below are less intrusive on Father's copyright interest than the state judicial actions specifically approved by the California court in *Worth.* In the absence of any clear federal intent to preempt the effects of generic state law on child support, and relying on the discussion in the *Worth* opinion (although we need not adopt its holding, *see Rodrigue v. Rodrigue,* F.Supp.2d 534 (E.D.La.)), we are not persuaded that the Copyright Act preempts the court's consideration of Father's income from copyrighted sources.

■ {24} Finally, Mother cross-appeals from the court's rejection of one special master recommendation concerning how to treat Father's tax-free income for purposes of cal-

culating his ability to pay child support. In this instance, Father projected 1996 interest earnings of approximately $80,000 from tax-free municipal bonds that the court appropriately included in Father's income. However, the special master recommended that a higher figure be used for child support purposes, one that would reflect the amount of pretax income it would take to produce a net yield on taxable bonds of $80,000 after taxes are paid. The special master calculated a hypothetical, pretax figure of $133,333 which it then recommended for use as income in the child support guidelines. As we understand it, the special master's recommendation was based on an assumption that income for computing the appropriate level of child support is presumed to be pretax income; in other words, that payment of future tax obligations is already factored into the child support guidelines in calculating how much will likely be available for child support. Accordingly, a parent who has income that will not be taxed, enjoys a windfall in terms of child support. To be consistent, the theory goes, the court should use a higher, hypothetical income figure representing what it would take in taxable income, at an assumed tax rate, to yield this same $80,000.

{25} We can discern no clear intent in the statute to consider hypothetical tax consequences of reported income before it is inserted into the child support tables. From a survey of the statutory language used in defining "gross income," we see that the Legislature has included all kinds of income without any express regard for the varying effect of taxes. *See* § 40-4-11.1(C)(2). For instance, capital gains are included as statutory income, yet it is common knowledge that capital gains are afforded preferential tax treatment, leaving a greater percentage available as disposable income after payment of taxes. Therefore, to be consistent with Mother's argument, a parent would have to use an adjusted income figure for capital gains as well. Other forms of income included in the statute, such as social security payments, disability payments, annuities, and worker compensation may have different tax consequences either in whole or in part. Yet the statute is silent on these tax issues. Imputed income is allowed elsewhere in the

statutory scheme in reference to a parent who is unemployed or underemployed, yet the statute makes no such provision here. *See* § 40–4–11.1(C)(1).

{26} We are mindful that one of the driving forces behind the child support guidelines is efficiency and ease of administration. *See* § 40–4–11.1(B)(3). We should avoid "introducing such complexity into the process" without a clear indication of legislative intent. *Leeder*, 118 N.M. at 609, 884 P.2d at 499. Imputing income in the manner advocated by Mother would inevitably complicate what is now a reasonably straightforward process.

{27} We hold that the child support guidelines do not envision imputing income in anticipation of tax consequences. We also acknowledge the provisions in Section 40–4–11.1(A) that authorize a court to deviate from the guidelines when supported by a "statement of the reasons for the deviation." In *extraordinary circumstances, properly documented*, a court might be authorized to deviate from the guidelines in consideration of tax consequence, as with many other factors that conceivably might justify such a deviation. However, in this instance the district court declined to deviate from the guidelines, and based on this record we are not persuaded by Mother's argument that the court abused its discretion in its decision.

## CONCLUSION

{28} We affirm in part and reverse in part and remand for further proceedings consistent with this opinion. Each party shall bear his or her own costs and attorney fees on appeal.

{29} **IT IS SO ORDERED.**

HARTZ and SUTIN, JJ., concur.