This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**RONALD ROBERT BACA,**

Petitioner-Appellant,

v.                                                                    **No.    32,223**

**SUSAN ANN BACA,**

Respondent-Appellee.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Elizabeth E. Whitefield, District Judge**

Oldaker, Norris & Rockwell, LLC
Linda Rockwell
Albuquerque, NM

for Appellant

L. Helen Bennett, P.C.
L. Helen Bennett
Albuquerque, NM

for Appellee

**MEMORANDUM OPINION**

**BUSTAMANTE, Judge.**

{1}    Ronald Robert Baca (Petitioner) appeals the district court's denial of his motion to modify child and spousal support. Concluding that the district court did not err in determining that Petitioner was voluntarily unemployed and imputing income to him, we affirm. We remand to the district court for entry of findings and conclusions related to child support payments and calculation of attorney fees.

**BACKGROUND**

{2}    Petitioner and Susan Ann Baca (Respondent) married in 1990. They have three children. They were divorced nearly twenty years later in March 2010. The proceedings relevant to the current matter include (i) the dissolution of marriage proceedings, (ii) a modification of child support one year after the dissolution, and (iii) the proceedings leading to the current appeal.

{3}    In the dissolution of marriage proceedings, the district court made findings related to Petitioner's conduct during discovery, the nature and division of the "Heartland" business, and Petitioner's income. We outline the findings in each of these categories as they relate to the current matter. The district court appointed a special master to advise the district court on the valuation of assets and income or potential income of the parties. Citing Petitioner's "fail[ure] to provide [the special master] with . . . information [he has] requested[,]" the special master filed a motion

to compel and for order to show cause. The district court granted the motion and ordered Petitioner to comply with the special master's request. In its dissolution order, the district court stated that it was "very concerned regarding Petitioner's persistent and continued pattern of non-compliance with discovery" and "Petitioner has failed to disclose assets, and[,] in fact, may have successfully hidden assets." It also referenced a bill for document shredding services which Respondent testified she discovered after the petition for dissolution was filed.

{4}     The district court also made findings about Petitioner's business known as "Heartland." It found that "Petitioner's business known now as 'Heartland' is . . . an existing asset" but also noted that "Petitioner maintains that he derives no income from 'Heartland.' " The district court found that Heartland was Petitioner's sole and separate property and that "[a]ny 'Heartland' income, earned by Petitioner, can be used to pay spousal support to . . . Respondent." Finally, the district court found that although "Petitioner has consistently stated that he is not generating any income[,] he is completely indigent, and that all business ventures are failing at this time[,]" it also found that "[this] position is contradicted by . . . discovery . . . and by the information revealed by the [s]pecial [m]aster's investigation and research." It stated that "Petitioner did concede that he is capable of making approximately $90,000 per year." The district court found that "[a]lthough . . . the [s]pecial [m]aster finds that

3

Petitioner's income earning potential should be imputed at $200,000[] per year, in doing equity, and in considering the current financial market, the [district c]ourt finds that Petitioner is fully capable of earning $150,000[] per year[.]" It thus imputed a monthly income of $12,500. It concluded that "both child support and spousal support should be calculated on this amount." Based on these findings, Petitioner was ordered to pay $2500 per month in child support and $1500 per month in spousal support. Petitioner did not appeal the district court's findings and conclusions.

{5} Approximately one year later, in April 2011, the child support order was modified upon Petitioner's motion. The hearing officer found that "[t]here is insufficient evidence to modify Petitioner's imputed income of $12,500 per month." But he recommended reduction of the child support obligation to $1683 per month based on changes in the primary physical custody of two of the children. He also found that child support arrearages totaled $12,860, plus interest, and spousal support arrearages totaled $12,000, plus interest. The hearing officer's recommendations were adopted by the district court.

{6} The present matter was initiated in November 2011 when both Petitioner and Respondent filed motions to modify the child support order, among other arrangements. Respondent argued that modification was appropriate because "the oldest child . . . ha[d] reached the age of majority . . . and the parties' [other] children

4

are living solely with Respondent." She also requested sole legal and physical custody of the two youngest children. Respondent also filed a motion to show cause why Petitioner should not be held in contempt for failure to pay court-ordered child support and spousal support. Petitioner argued that modification of child and spousal support was appropriate because "[h]e ha[d] been unable to find employment of any sort, and he is currently enrolled as a full-time student in the [Master's degree in business administration (MBA)] program at New Mexico Highlands University where he is attempting to obtain a[] degree to allow him to find employment."

{7} After a hearing, the district court made 103 findings of fact. Respondent's motion for sole legal and physical custody was denied based on the district court's finding that "[a] change from joint legal custody to sole legal custody does not fix the problem of inconsistent and haphazard paternal contact with the children."

{8} Petitioner's motion was also denied. Relevant to Petitioner's appeal, the district court found that (i) "[Petitioner] is voluntarily underemployed and unemployed"; (ii) "[Petitioner] . . . has resources of $100,000 available from Heartland, an investment he owns. [Petitioner] testified this [is] a loan and that he may be required to repay the loan if claims are made"; (iii) Petitioner has two checking accounts, one of which was the Heartland account; (iv) Petitioner used the Heartland account for personal expenses, including travel, during the same period that he did not pay his child and

spousal support obligations; (v) "[Petitioner] testified that the remaining amount he can 'borrow' from Heartland is $100,000"; (vi) Petitioner paid over $15,000 for the children's expenses between January 2011 and January 2012, which "is laudable but does not constitute child support or any credit against child support. It does support, however, [Petitioner's] ability to access funds when he chooses"; (vii) "[Petitioner] can certainly earn as much as [Respondent;]"; and (viii) Petitioner owed $33,000 and $13,736 in spousal support and child support arrearages, respectively. The district court concluded that "[t]here is no material change in circumstances which warrants a modification in the amount of child support or spousal support." Petitioner was also found in contempt of court for failure to pay child and spousal support.

{9}     Petitioner makes a number of interwoven allegations of error in the second modification proceeding. Petitioner argues that the district court erred when it failed to consider Petitioner's efforts to become employed, imputed to him the amount available through the Heartland business, failed to determine Respondent's actual need for spousal support, miscalculated the amount of child support arrearages, and ordered him to obtain life insurance. We address these arguments in turn.

**DISCUSSION**

{10}     Petitioner's first two issues have to do with when and how the district court may impute income to a parent for the purposes of setting child support payments. "The

6

setting of child support is left to the sound discretion of the [district] court as long as that discretion is exercised in accordance with the child support guidelines." *Quintana v. Eddins*, 2002-NMCA-008, ¶ 9, 131 N.M. 435, 38 P.3d 203. "Findings made by the district court about the parents' incomes, as required by the guidelines to apportion child support, are reviewed to determine whether they are supported by substantial evidence. Questions of law are reviewed de novo." *Grant v. Cumiford*, 2005-NMCA-058, ¶ 21, 137 N.M. 485, 112 P.3d 1142 (citations omitted).

{11} Determination of child support is governed by NMSA 1978, Sections 40-4-11 to 11.6 (1971, as amended through 2008). When a court has ordered child support, the order may be modified only "upon a showing of material and substantial changes in circumstances subsequent to the adjudication of the pre-existing order." Section 40-4-11.4(A). If a motion for modification is filed at least one year after entry of the order and recalculation of the child support obligation results in a twenty percent variance from the existing child support obligation, "[t]here shall be a presumption of material and substantial changes in circumstances." *Id.* Section 40-4-11.1 sets out the guidelines for calculation of child support. In order to apply these guidelines, the district court must first determine the gross income of each parent. *See* § 40-4-11.1(E), Worksheets A and B; *Perkins v. Rowson*, 110 N.M. 671, 674, 798 P.2d 1057, 1060 (Ct. App. 1990) ("Section 11.1 requires the court to use the method set out in the

7

statute to calculate a parent's support obligation and declares that there is a rebuttable presumption that the amounts derived from these calculations are the amount of the support obligation."). Section 40-4-11.1(C)(1) defines "income" as "actual gross income of a parent if employed to full capacity or potential income if unemployed or underemployed." Subsection (C)(2) goes on to define "gross income" as

> income from any source and includes but is not limited to income from salaries, wages, tips, commissions, bonuses, dividends, severance pay, pensions, interest, trust income, annuities, capital gains, social security benefits, workers' compensation benefits, unemployment insurance benefits, disability insurance benefits, significant in-kind benefits that reduce personal living expenses, prizes[,] and alimony or maintenance received[.]

{12}    Thus, under the statute, the court may impute income to a parent for purposes of calculation of child support if it determines that the parent is underemployed or unemployed. Our case law makes clear, however, that the imputation of income based on underemployment or unemployment depends on whether the parent is underemployed or unemployed in an effort to avoid child support, i.e., whether the parent is acting in good faith. *See Boutz v. Donaldson*, 1999-NMCA-131, ¶ 6, 128 N.M. 232, 991 P.2d 517. " '[G]ood faith' . . . means acting for a purpose other than to reduce or avoid a child support obligation. [When] a parent does not act primarily to affect a child support obligation, the relevant inquiry is whether the parent's career choices are reasonable under the circumstances." *Quintana*, 2002-NMCA-008, ¶ 17

8

(citation omitted). The parent claiming an inability to pay child support bears the burden to demonstrate inability. *Thomasson v. Johnson*, 120 N.M. 512, 516, 903 P.2d 254, 258 (Ct. App. 1995).

**Voluntary Underemployment or Unemployment**

{13} Petitioner's first argument is that the district court erred when it determined that he was voluntarily under or unemployed. He makes a number of assertions on this issue. He contends that "[t]he [district] court made no finding that [Petitioner] was voluntarily unemployed or underemployed, and that was error" and that "the [district] court failed to take into consideration [Petitioner's] efforts to find employment." These assertions are contradicted by the record. In fact, the district court found specifically that "[Petitioner] is voluntarily underemployed and unemployed." In addition, it acknowledged Petitioner's testimony that he had submitted his resume to over 300 "executive search firms" and enlisted the assistance of professional resume writers and that he had not received any job offers. The district court noted Petitioner's testimony that "he returned to school to get an MBA because he believes it will increase his chances of employability." Finally, it concluded that "[Petitioner] is not making a good faith effort to find employment since the parties['] divorce."

{14} Petitioner also argues that because Respondent did not present evidence of available jobs appropriate for Petitioner, "all of the evidence was that [Petitioner] had

9

not been able to find any job at all." To the extent that Petitioner's argument is that Respondent was required to prove that he was acting in bad faith, this is incorrect. Section 40-4-11.1(C)(1) creates a presumption that a parent will earn income based on full-time employment. *See Styka v. Styka*, 1999-NMCA-002, ¶ 35, 126 N.M. 515, 972 P.2d 16. It was Petitioner's burden to demonstrate his inability to do so. *Thomasson*, 120 N.M. at 516, 903 P.2d at 258.

{15}    In addition, Petitioner maintains that since the only evidence at the hearing was his testimony about his efforts to find a job, there was insufficient evidence for the district court to find that he was voluntarily unemployed and to conclude that his efforts were not in good faith. This position ignores both Petitioner's burden and the role of the district court in assessing the credibility of evidence presented by the party with the burden of proof. "It is for [district] court to weigh the testimony, determine the credibility of witnesses, reconcile inconsistent statements[,] and determine where the truth lies." *Lopez v. Adams*, 116 N.M. 757, 758, 867 P.2d 427, 428 (Ct. App. 1993). "If a finding is made against the party with the burden of proof, we can affirm if it was rational for the [district] court to disbelieve the evidence offered by that party." *Id.* Even when testimony is not contradicted, the district court is not required to accept it "if . . . the witness is shown to be unworthy of belief, or . . . his testimony . . . contains inherent improbabilities, or [there is] reasonable doubt as to its . . .

10

veracity[] by legitimate inferences drawn from the facts . . . of the case." *State v. Lovato*, 112 N.M. 517, 521, 817 P.2d 251, 255 (Ct. App. 1991). It is clear from the district court's findings of fact, conclusions of law, and order that it did not believe Petitioner's testimony that he was actively seeking employment in good faith. *See Thomasson*, 120 N.M. at 514, 903 P.2d at 256. Our inquiry, then, is whether it was rational for the district court to disbelieve Petitioner's testimony to the contrary.

{16}     In addition to the testimony above, the district court heard testimony that during the marriage Petitioner had worked as an entrepreneur in the construction and mortgage industries and that his last employment was as a consultant from 2005 to 2007 for which he was paid $7,500 per month. Respondent testified that Petitioner had owned a mortgage company during the marriage. Petitioner testified that he had sent his resume to over 300 firms but did not provide documentation of the firms to which he had applied or of the "executive search firms" he had contacted nor did he provide information about specific jobs for which he had applied. He stated that he was open to any kind of work but also stated that he was not using the internet to search for jobs and chose to rely instead on his network of contacts and that he had not had a job interview. Finally, Petitioner testified that he was not looking for work while a student in the MBA program. Reviewing the entirety of the testimony, we conclude that the testimony, though uncontradicted, could raise "reasonable doubt as

11

to its . . . veracity[] by legitimate inferences drawn from the facts" and thus it was rational for the district court to disbelieve Petitioner's testimony that he was actively seeking work in good faith. *Lovato*, 112 N.M. at 521, 817 P.2d at 255.

{17} Petitioner also argues that enrollment in the MBA program full time "is a change of circumstance which the court may consider . . . when addressing a motion to modify support" and that child support should be reduced based on that change. The district court noted Petitioner's testimony about his decision to return to school. It stated that "[Petitioner] testified that he returned to school to get an MBA because he believes it will increase his chances of employability." It also acknowledged Petitioner's testimony "that he was a full-time graduate student . . . in order to earn an MBA, which he hoped would make him employable, and . . . that he hoped to graduate . . . in December 2012." Finally, the district court noted that "[Petitioner] produced evidence that he had been enrolled as a full[-]time graduate student . . . since spring semester 2011, produced evidence that he was maintaining a 4.0 grade point average, and produced a substantial rough draft of a Master's thesis."

{18} Petitioner is correct that a return to school "*may* constitute a material change in circumstances that warrants a reduction in a spouse's support obligations." *Wolcott v. Wolcott*, 105 N.M. 608, 609, 735 P.2d 326, 327 (Ct. App. 1987). But adjustment of support obligations is not automatic. *Id.* at 610, 735 P.2d at 328 (noting that "this

12

change does not automatically mandate a reduction in his support obligation"). When a parent leaves the workforce to seek higher education or training, "the court must determine whether the reduction in income is both in good faith and reasonably calculated to ensure the economic well-being of both the payor and the persons to whom a duty of support is owed." Lewis Becker, *Spousal and Child Support and the "Voluntary Reduction of Income" Doctrine*, 29 Conn. L. Rev. 647, 672 (1997); *cf. Quintana*, 2002-NMCA-008, ¶ 17 ("In cases in which a parent does not act primarily to affect a child support obligation, the relevant inquiry is whether the parent's career choices are reasonable under the circumstances."). The finding that Petitioner was voluntarily underemployed and unemployed during the time he pursued the MBA together with the conclusion that Petitioner did not make a good faith effort to find employment since the parties' divorce indicate that the district court rejected Petitioner's testimony that he had "no other solution" than to seek higher education. These findings and conclusions also lead to the rational conclusion that pursuit of an MBA was not a reasonable choice.

**{19}** We conclude that Petitioner failed to meet his burden of proof as to his inability to find employment and as to the reasonableness of his choice to pursue an MBA and, thus, the district court did not err in finding that there was no material change in circumstances which warranted a modification in the amount of child support. We

13

cannot fault the district court for rejecting Petitioner's view that the MBA program choice was reasonable even if the court did not enter a specific finding of fact or conclusion of law in regard to the choice issue.

**Imputing Income**

{20} The second issue is whether the district court erred in imputing income to Petitioner. Petitioner states he "has no quarrel with the district court's imputing income to him equal to [Respondent's] income." In fact, Petitioner requested a conclusion of law that "[i]t is reasonable for the court to impute an income to Petitioner equal to Respondent's income." (We note that this concession appears to support the district court's finding that Petitioner was voluntarily under or unemployed.) Although not contesting the imputation of $3064 per month in income, Petitioner contends that the characterization of the Heartland funds as income "is contrary to the plain language of . . . Section 40-4-11.1(C)(2) and is[,] therefore[,] error."

{21} Petitioner directs us to several cases to support his assertion that "[i]mputing [Petitioner's] income based on his ability to borrow against an asset is error." In *Styka*, this Court affirmed the district court's exclusion of monetary gifts from the income calculations for one party, "hold[ing] that gross income generally does not include gifts under Section 40-4-11.1(C)(2)." *Styka*, 1999-NMCA-002, ¶ 24. The

*Styka* Court acknowledged, however, that it might have been permissible for the district court to include gifts as income if the petitioner had requested a deviation from the guidelines in the district court. *Id.* ¶ 25. In addition, the Court held that although the value of assets divided after divorce is not income under the guidelines, "[i]nterest earned on assets received in a property distribution . . . is income for purposes of child support." *Id.* ¶ 26. It found error in the district court's calculation of interest income from investment of funds received in the division of property. *Id.* ¶ 30. The funds at issue here are neither gifts nor interest income from assets. We fail to see how these holdings are applicable here.

{22}    Petitioner also relies on *Leeder v. Leeder*, 118 N.M. 603, 609, 884 P.2d 494, 500 (Ct. App. 1994) upon which the *Styka* Court also relied. *Styka*, 1999-NMCA-002, ¶ 26. In *Leeder*, this Court considered whether payments from one party to the other for "equalization of division of the parties' community assets" are "income" under the guidelines. *Leeder*, 118 N.M. at 608, 884 P.2d at 499. It determined such payments were not income because "we [do] not construe a division of community property as a sale of property from one spouse to the other. There being no sale, there is no income." *Id.* The *Leeder* holding on which Petitioner relies is inapposite to this case. *Leeder* prohibits calculation of income based on the value of an asset awarded to one party in the division of assets after divorce. *Id.* Here, the district court did not

15

calculate Petitioner's income based on the value of the Heartland business itself; rather, Petitioner's imputed income was based on the cash available to Petitioner through the Heartland business. The district court's finding was not contrary to *Leeder*.

{23} Moreover, the nature of the Heartland bank account is such that Petitioner has access to it for personal living and travel expenses. In *Boutz*, this Court stated that "[t]he definition of gross income in the child support guidelines represents a legislative effort to estimate 'actual cash flow,' that is the amount of money that will actually be available to support the children. Technical definitions that run contrary to this central purpose are disfavored." 1999-NMCA-131, ¶ 14 (citation omitted); *see Major v. Major*, 1998-NMCA-001 ¶ 9, 124 N.M. 436, 952 P.2d 37 (equating "actual cash flow" with the money "reasonably available to apply toward the support of his [or her] children"). Funds not generally considered income may be treated as such when a party uses them in place of income. For example, in *Webb v. Menix*, the Court determined that "the principal of [a] lump sum settlement award was not income available to the child for child support purposes *except to the extent that [the parent] actually withdrew it for his own purposes*." 2004-NMCA-048, ¶ 30, 135 N.M. 531, 90 P.3d 989 (emphasis added); *see id.* ¶ 28 (stating that the parent used the interest and principal of the award "as a source of income").

{24} In the modification hearing, Petitioner testified that he could write a check to Respondent at any time up to the amount in the Heartland account and that he could "draw down" up to $100,000 in additional funds. Respondent presented evidence that in early 2011 the account held over $340,000, and Petitioner testified that as of the date of the hearing the account held approximately $7,000. The district court noted that in spite of Petitioner's claims that he had no income from wages and no income from the Heartland business, Petitioner had paid over $15,000 for expenses for the children. It also found that "[Petitioner's] tax returns do not indicate the real cash that is available to [Petitioner] as a comparison of his 2011 bank statements and 2010 [and] 2011 tax returns show." It imputed the amount available to "borrow" to Petitioner as income.

{25} We conclude that under the facts of the case the district court did not err in imputing to Petitioner the balance of the amount he could access through Heartland. The fact that Petitioner might have to pay those monies back to Heartland is not in and of itself a reason not to impute the Heartland funds to him when Petitioner was living off of the Heartland funds. *See Padilla v. Montano*, 116 N.M. 398, 404, 862 P.2d 1257, 1263 (Ct. App. 1993) ("[A] father has a duty to exhaust every reasonable resource to support his minor children."); *cf. Quintana*, 2002-NMCA-008, ¶¶ 27-31 (holding that earnings from retirement funds were appropriately included in child

17

support calculations, that "[t]he fact that [f]ather would pay a penalty for withdrawing money from the [retirement account] prior to reaching the age of retirement does not render the money unavailable[,]" and that a retirement account is appropriately considered "an alternative source of income for meeting his child support obligation should [f]ather's other sources of income prove insufficient"). "The purposes of allowing a [district] court to impute income to an underemployed parent are to discourage the parent from shirking the obligation to support one's children and to encourage the underemployed parent to work at full capacity for the benefit of the children." *Id.* ¶ 16. Here, the testimony reveals that Petitioner uses the Heartland funds to pay his living expenses, including personal and travel expenses, as well as expenses of the children that do not constitute child support. Given that the district court found that Petitioner was voluntarily unemployed, to hold that the district court erred in imputing the amount available to Petitioner through Heartland as income would undermine the purpose of imputing income. The district court did not abuse its discretion in imputing these funds to Petitioner.

**Spousal Support**

{26}     Petitioner argues that the district court erred when it failed to "make any findings as to [Respondent's] actual need for spousal support." Since Petitioner did not challenge the findings of the dissolution order, we understand his argument to be

18

that the district court in this modification proceeding did not make specific findings of an *ongoing* need for spousal support. We review the award of spousal support for an abuse of discretion. *Bustos v. Bustos*, 100 N.M. 556, 559, 673 P.2d 1289, 1292 (1983) ("The award of alimony, the amount of such alimony if awarded, and the duration of an alimony award, are all left to the discretion of the district court."). "New Mexico cases indicate that the threshold question for the award of spousal support is need." *Lebeck v. Lebeck*, 118 N.M. 367, 370, 881 P.2d 727, 730 (Ct. App. 1994). In the dissolution order, the district court stated that it had considered the factors in NMSA 1978, Section 40-4-7(E)(1) to (10) (1997), and found that "Respondent is in need of spousal support" and that "Respondent testified that she would need approximately two (2) years of education and/or training in the health care field, to earn a commensurate salary in the labor force." In addition, it ordered Respondent to "enroll in the necessary education programs to obtain her [c]ertification in her prior profession. Spousal [s]upport shall be reviewed in two (2) years, to include any change in her monthly income as a result of any [c]ertification, or lack thereof." We conclude that this order is consistent with rehabilitative spousal support, which "provides the receiving spouse with education, training, work experience[,] or other forms of rehabilitation that increases the receiving spouse's ability to earn income and become self-supporting." Section 40-4-7(B)(1)(a).

**{27}** Section 40-4-7(B)(2)(a) provides that a spousal support order may be modified "whenever the circumstances render such change proper[.]" Here, the district court concluded that "[t]here is no material change in circumstances which warrants a modification in the amount of . . . spousal support." Petitioner argues that modification of spousal support was appropriate because Respondent "failed to show any evidence that she had enrolled in any education programs or that she had made progress of any kind whatsoever." This is a rather dramatic mischaracterization of the evidence. Respondent testified that she had been attending classes while working 35 to 42 hours per week in order to prepare for a physical therapy assistant program to begin in summer 2012. Respondent provided a copy of a performance evaluation by her employer indicating that she had qualified for a merit increase at her current job from $17.74 per hour to $18.45 per hour. She also presented documentary evidence of her enrollment in the summer program and a copy of a job description for a physical therapy assistant position similar to one she intended to seek upon completion of the program. This evidence supports a conclusion that Respondent was acting to improve her earning capacity consistent with the original spousal support determination, but had not yet achieved the rehabilitation contemplated. We discern no abuse of discretion in the district court's conclusion that there were no material changes in Respondent's circumstances warranting modification of spousal support.

20

*See Sims v. Sims*, 1996-NMSC-078, ¶ 65, 122 N.M. 618, 930 P.2d 153 ("An abuse of discretion occurs when a ruling is clearly contrary to the logical conclusions demanded by the facts and circumstances of the case.")

**Child Support**

{28}     Finally, Petitioner argues that the district court erred in calculating the amount he had paid toward child support.  Specifically he argues that the district court erred in relying on Respondent's testimony as to what amount she had received rather than on the evidence he presented in the hearing.  He argues that he "should have been given credit of $27,900 in payments to [Respondent]" or "[a]t a minimum, [he] should have been given credit for payments in the amount of $22,400."  Since Petitioner was given credit for $23,900, we do not address his second argument.

{29}     Petitioner presented copies of four checks with which he purchased cashier's checks which he testified had been given to Respondent.  Although Petitioner provided copies of the checks to the bank to purchase the cashier's checks, he provided no documentation that Respondent actually received the cashier's checks. Respondent's testimony was that she "[was] not sure without looking at the cashier's check" if she had received those monies from Petitioner.  She also testified that she did receive some cashier's checks from Petitioner, but "without looking at [her] list, [she was] not sure the[] amounts match[ed] up."  After reviewing a list of payments

21

that Petitioner claimed had been made, Respondent first stated that she had received all of them. She then stated that she was disputing three checks from Petitioner that were for the children's expenses outside of child support and that she was not sure whether she had received the cashier's checks. The district court found that "[Respondent] admits she did receive some certified funds but could not say whether [three specific cashier's checks] were given to her as certified funds." It also found that "[t]he burden of proving payment is [Petitioner's]" and "[s]ince [Petitioner] did not provide documentation of those [three] certified checks, [Respondent's] record of payments is accepted."

{30}     We are not convinced the district court was correct in stating that Petitioner bears the burden of proving payment. Further, after a careful review of the record, we cannot tell how the district court arrived at the amount credited to Petitioner. Several incongruities make the record confusing. First, the district court credited Petitioner with payments through November 2011 of $17,500. It appears that this is the sum of the amount Respondent claimed to have received in her motion plus one additional payment received before the hearing. Respondent stated in the hearing that she had a list of all the payments received but her counsel could not find it during the hearing and said he would provide it to the district court. We infer that the court relied on documents provided outside of the hearing and not on the record on appeal. Since this

document is not in the record, we cannot tell whether the amount Respondent claimed to have received included any of the cashier's checks presented by Petitioner. Second, it appears that Petitioner may have been given credit for some of the cashier's checks but not others. Third, the district court mischaracterized Respondent's testimony regarding one of the checks. Respondent challenged several payments on the ground that they were for expenses not related to child support. The district court did not credit Petitioner with one of these payments. Although the district court stated that Respondent claimed she could not say whether she received this check, in fact Respondent admitted receiving it. In addition, since the district court credited Petitioner with two other checks that Respondent claimed were not for child support, it would have been more consistent to credit this payment to Petitioner. Finally, while Respondent asserts that "substantial evidence supports the result reached by the [d]istrict [c]ourt[,]" she does not include any reference to the record in support of this assertion. *Muse v. Muse*, 2009-NMCA-003, ¶ 72, 145 N.M. 451, 200 P.3d 104 ("We will not search the record for facts, arguments, and rulings in order to support generalized arguments.").

{31} "[W]e conclude that even construing all of the evidence in the light most favorable to its findings, and indulging in all reasonable inferences in support thereof, the [district] court's findings and conclusions fail to adequately disclose how it arrived

23

at its decision" as to the amount Petitioner had paid. *El Paso Field Servs. Co. v. Montoya Sheep & Cattle Co.*, 2003-NMCA-113, ¶ 16, 134 N.M. 375, 77 P.3d 279; *Kruskal v. Moss*, 1998-NMCA-073, ¶ 10, 125 N.M. 262, 960 P.2d 350. We therefore remand to the district court to clarify its findings and calculations.

**Life Insurance**

{32}     We find no error in the district court's order for "[Petitioner] . . . to comply with previously existing orders and maintain life insurance covering his life of $250,000." Petitioner was ordered to obtain life insurance at the conclusion of the dissolution proceedings. He did not appeal the order. Such an order is consistent with Section 40-4-7(E)(4)(c). In the modification hearing, Petitioner testified that he "had applied for life insurance and had been turned down because of pre-existing conditions and lack of income." He did not provide copies of rejection letters or other documentation of his attempts to secure life insurance. He did not provide documentation of medical conditions that would limit his ability to obtain insurance. Although Respondent presented no evidence to the contrary, the district court found that "[Petitioner] was not credible." *See Lopez*, 116 N.M. at 758, 867 P.2d at 428 ("If a finding is made against the party with the burden of proof, we can affirm if it was rational for the [district] court to disbelieve the evidence offered by that party."); *Lovato*, 112 N.M. at 521, 817 P.2d at 255 (discussing when the district court is not required to accept

24

uncontradicted testimony); *cf. Spingola v. Spingola*, 91 N.M. 737, 742, 580 P.2d 958, 963 (1978) ("The burden of proof is on the moving party to satisfy the court that the circumstances have so changed as to justify the modification."). The district court did not err in ordering Petitioner to obtain life insurance.

**Attorney Fees**

{33} Both parties seek attorney fees on appeal. Generally, parties are responsible for their own attorney fees "unless [recovery of fees is] authorized by a statute, a court rule, or an agreement expressly permitting their recovery." *Monsanto v. Monsanto*, 119 N.M. 678, 681, 894 P.2d 1034, 1037 (Ct. App. 1995). Here, attorney fees are permitted by statute. *See* § 40-4-7(A) ("The court may make an order, relative to the expenses of the proceeding, as will ensure either party an efficient preparation and presentation of his case."); *Rhinehart v. Nowlin*, 111 N.M. 319, 330, 805 P.2d 88, 99 (Ct. App. 1990) ("New Mexico law permits the award of attorney fees on appeal in domestic relation cases."). "In determining whether to award attorney fees, a showing of economic disparity, the need of one party, and the ability of the other to pay, has been characterized as the primary test in New Mexico." *Quintana*, 2002-NMCA-008, ¶ 33 (internal quotation marks and citation omitted). Here, Petitioner is imputed with income of $136,644 per year ($11,387 per month). The district court found Respondent's income to be $3,064 per month. In addition, Respondent is owed over

25

$45,000 in child and spousal support arrearages and has prevailed in both the district and appellate courts. We conclude that an award of attorney fees on appeal from Petitioner to Respondent is warranted. We remand to the district court for calculation of reasonable attorney fees.

**CONCLUSION**

{34} We affirm the district court's denial of Petitioner's motion for modification of child support and spousal support and remand for entry of findings and conclusions on the amount of child support payments and calculation of attorney fees.

{35} **IT IS SO ORDERED.**

_____
**MICHAEL D. BUSTAMANTE, Judge**

**WE CONCUR:**

_____
**JONATHAN B. SUTIN, Judge**

_____
**M. MONICA ZAMORA, Judge**